[Crim. No. 5670.   Second Dist., Div. One.   Nov. 14, 1956.]

THE PEOPLE, Respondent, v. CEDRIC CLINTON BYNON, Appellant.

Eugene V. McPherson, Joseph A. Armstrong and Gladys Towles Root for Appellant.

Edmund G. Brown, Attorney General, Clarence A. Linn, Assistant Attorney General, and Raymond M. Momboisse, Deputy Attorney General, for Respondent.

FOURT, J.—The defendant was charged by an information with violating the provisions of section 288, Penal Code (crimes against children, lewd and lascivious acts), and section 285 of the Penal Code (incest). The trial was commenced with a jury on October 21, 1955, and prior to the swearing of any witness, and outside the hearing and presence of the jury, upon the motion of the district attorney, the count having to do with incest was dismissed. It was apparently established by certain birth certificates and adoption papers produced by the defendant that the child in question was not the natural daughter of the defendant.

The jury found the defendant guilty as to the charge under

section 288 of the Penal Code. Sexual psychopathy proceedings were had, pursuant to the law, the defendant was found to be a probable sex psychopath and committed to Atascadero State Hospital for a period of observation. Within due time the superintendent of the hospital made a report to the court to the effect that the defendant was not a sex psychopath and he was returned to the court for further proceedings. His application for probation was denied and judgment was entered that he be committed to the state prison.

A résumé of the testimony is as follows: Linda Bynon was about 12 years of age and was either adopted by the defendant and his wife or was living with the defendant and his wife under arrangements where adoption proceedings were contemplated. The defendant, his wife and Linda resided in Springfield, Missouri before the episodes complained of in the information. In December of 1954, the defendant and Linda came to Los Angeles County while the wife of the defendant remained in Springfield, Missouri. When they first arrived in Los Angeles County they resided alone in an apartment on Grattan and there the defendant had one or more acts of intercourse with Linda. For about three weeks, in January of 1955, the defendant was ill, and during such time the child resided with a relative in Long Beach. Thereafter, she returned to live with the defendant at a second apartment on Grattan, where he frequently had acts of intercourse with Linda. In about May, 1955, they moved to another apartment on Burlington Avenue, where they lived alone and engaged in acts of intercourse. The child discovered that she was pregnant and told the defendant of her condition. She was instructed by the defendant to say, if anything happened, that she had gotten into trouble with a sailor while in Long Beach. She had never had intercourse with any sailor. After the child informed the defendant of her pregnant condition he continued to have sexual relations with her up until about the early part of August, 1955. On September 21, 1955, Linda gave birth to a baby boy. The defendant did not inform his wife of Linda's condition and he provided no medical care and attention for her. Furthermore, he made no report of the situation to any constituted authority.

The district attorney, in his case in chief, asked the question of Linda, ''Did you ever have any sexual relations with any other individual other than your father?'' and her answer was, ''No.''

On October 13, 1955, in an ex parte proceeding, the

following took place in a department of the superior court other than the department where the case was tried:

"THE COURT: Bynon.

"MR. ROSEN (Public Defender): Your Honor, this case is set for trial in this court on October 21st. I have advanced it to this date in order to make a motion and a request of the Court.

"The Charge here is incest, 288, on an adopted daughter of this defendant. This girl gave birth, Your Honor, just recently to the child that is supposed to be the child of this defendant. She had testified at the preliminary hearing that she never had any intercourse with anybody other than this defendant. This defendant has always, to me, proclaimed his innocence in this matter and desires to have blood tests taken of the mother, the child, and himself.

"He does not have sufficient funds, Your Honor, with which to pay for these blood tests and he has requested me to ask the Court to appoint a doctor to make these blood tests.

"I feel that they are material. A blood test would be material. Because if it would bring this defendant in the category that eliminated him as the father, why, then in view of the testimony of the child I think it would be almost tantamount to showing that this defendant did not have sexual relations with this child that she claimed.

"The child, I might say, Your Honor, is in Juvenile custody. Her baby is under the control of the Juvenile authorities.

"THE COURT: Is the mother willing to undergo such procedure?

"MR. ROSEN: I have never talked to her.

"THE COURT: This Court has no authority to order the witnesses in this matter to submit to any kind of a test.

"MR. ROSEN: Well, it would have——

"THE COURT: In civil matters, the matter of blood tests are matters of stipulation or a party refusing in a civil case, of course, has certain benefits resulting from a refusal, but that doesn't apply to criminal procedure I am informed. Moreover, I don't know of any procedure whereby this Court can be called upon to supply the funds with which to enable the defendant to conduct his defense other than to appoint a public defender.

"MR. ROSEN: Well, I appreciate those factors, Your Honor.

"THE COURT: I would say that your point may be well taken, that if you could get a negative test, it would be very beneficial.

"MR. ROSEN: There is no question about that. This defendant having the lack of funds with which to be able to pay a doctor requested that this motion be made.

"THE COURT: I would say that in a case of this nature, a test would be of no benefit to you whatsoever unless it were negative.

"MR. ROSEN: That is very true. I explained that to the defendant. There is no question about that.

"THE COURT: I can't see any reason why the mother of the child should not be willing if she is of the conviction that the defendant is the only person with whom she has had relationships. She should be the first one to be willing to undergo such tests.

"I would say that is a matter that you should try to work out with the prosecutor.

"MR. ROSEN: Very well."

Sections 1980.3 and 1980.7 of the Code of Civil Procedure are set forth in the footnote.[1] The trial judge seemed to be of the opinion that the blood tests would be relevant and that they could be important to the defendant.

The attorney general points out that the court merely stated that he had no authority to order the witnesses to submit to any kind of a test, and that he was unaware of any procedure whereby the court could be called upon to supply the funds with which to enable a defendant to conduct his defense other than to appoint a public defender. However, we believe the action of the judge was, for all intents and purposes, tantamount to a denial of the defendant's motion, and all parties, thereafter, apparently considered that the de-

---

[1]Uniform Act on Blood Tests to Determine Paternity. "§ 1980.3 [Paternity actions: Blood tests: Effect of refusal to submit thereto.] In a civil action, in which paternity *is a relevant fact*, the court, upon its own initiative or upon suggestion made by or on behalf of any person whose blood is involved may, or upon motion of any party to the action made at a time so as not to delay the proceedings unduly, shall order the mother, child and alleged father to submit to blood tests. If any party refuses to submit to such tests, the court may resolve the question of paternity against such party or enforce its order if the rights of others and the interests of justice so require."

"§ 1980.7 [Application of chapter: Limitations.] This chapter shall apply to criminal cases subject to the following limitations and provisions: (a) An order for the tests shall be made only upon application of a party or on the court's initiative; (b) the compensation of the experts shall be paid by the county under order of court; (c) the court may direct a verdict of acquittal upon the conclusions of all the experts under the provisions of Section 1980.6, otherwise the case shall be submitted for determination upon all the evidence."

fendant would not be permitted to have the results of such tests in his defense.

At the time of the pronouncement of judgment proceedings, the defendant himself stated to the judge:

"Your Honor, when I heard the child was born, I went down before Judge Irwin, who I was originally to be tried before, and requested a blood test to establish parentage, and Judge Irwin denied me the privilege of having that blood test on the ground that he couldn't order the witness to have it."

It is true that in this case the matter of the paternity of the child is not the main issue, but rather whether the defendant committed acts which were prohibited by section 288 of the Penal Code. However, it is also true that the prosecution repeatedly referred to the birth of the child and placed great weight in their prosecution on the fact that defendant had failed to supply medical care and that he had not advised his wife of the pregnancy. In other words, the testimony concerning the alleged acts of intercourse, the baby, and who its parents were is so intermixed and commingled that it is impossible to say that in no sense did the jury consider the paternity of the child. Under the circumstances the paternity of the child was a "relevant fact" in the case, and such being true, the blood test results would have been extremely important.

The district attorney had in mind that the matter of the paternity of the child was a relevant fact, otherwise he would not have made the inquiry he did to point up that Linda had never had sexual relations with anyone whomsoever other than the defendant. The prosecution by their own course developed the evidence into a state where according to all of the prosecution testimony the defendant and no one else could possibly have been the father of the child and at the same time he was prevented from possibly showing as a scientific certainty that he could not have been the father of the child.

In argument before the jury the district attorney stated in substance that in cases having to do with burglary or robbery some sort of physical evidence was available, that "in some cases you have seen the results of scientific investigation." Further, he stated, ". . . in these sex cases—— we are . . . down to the fundamental issues—— that there is obviously no scientific detection that can be applied to a case of this sort, except in this matter there isn't any doubt in

the world that an act of sexual intercourse has taken place here, because a baby has been born to this 12-year-old.

. . . . . . . . . . . . . .

"Now, first of all, we do know that an act of intercourse took place, a youngster was born . . . who is telling the truth. Is it the defendant or is it this 12-year-old, . . ."

It is evident that if the defendant had been able to establish by the blood tests that he could not possibly have been the father of the child he would have effectively impeached Linda's testimony.

In the case of *State* v. *Damm*, 64 S.D. 309 [266 N.W. 667, 670], the court made some observations which seem appropriate here: "All judicial powers are vested in the courts . . . and the judiciary constitutes a separate, distinct and co-ordinate department of the government of the sovereign state. . . . The primary function of the judiciary is the administration of justice, and justice can never be rightly administered unless truth be first ascertained as nearly as may be. See Brewer, J., dissenting, in *Union Pac. Ry. Co.* v. *Botsford* (1891), 141 U.S. 250 [11 S.Ct. 1000, 35 L.Ed. 734]. The citizen holds his citizenship subject to the duty to furnish to the courts, from time to time and within reasonable limits (which are for the courts to determine), such assistance as the courts may demand of him in their efforts to ascertain truth in controversies before them. This is just as much a part of the citizen's inescapable duty of supporting his government as is military service in time of war, or any other like obligation. We perceive no valid reason why courts of record may not require of any person within their jurisdiction the furnishing of a few drops of blood for test purposes when, in the opinion of the court, so to do will or may materially assist in administering justice in a pending matter. We perceive no reason why this is not just as proper, and just as justifiable, as it is for the same court to require the same person to attend in court for days upon end as a witness; to bring in his books, documents, and papers; and even to abide in jail unless he can satisfy the court that he will be present as a witness when desired. The order for such test should be adequately safeguarded of course, which can easily be done, as well pointed out in *Hayt* v. *Brewster, Gordon & Co., supra* [199 App.Div. 68 (191 N.Y.S. 176)]; and it should issue not as a matter of absolute right, but in the sound discretion of the court, which discretion may be

reviewed if it is abused in either direction. Indeed we might even go further. As has been often said, a trial judge should not be a mere umpire presiding over a game of skill conducted by counsel. It is difficult to see any reason why a trial judge might not of his own motion in a given case, if he thought it likely to be helpful, order the making of a blood test by a competent person and a report thereon under oath subject to cross-examination by both parties."

In the Commissioners' Prefatory Note to the Uniform Act on Blood Tests to Determine Paternity it is stated (9 Uniform Laws Annotated, 1955 Pocket Part, pages 13, 14, 15, 18):

"As to the make-up of the blood, the testing process is reasonably simple. It is practically the same thing in which the 11 million or more men were tested in determining blood types in the service. It is the same kind of test made of the blood of donors to the Red Cross and hospital blood banks. Consequently, this is one of the few classes of cases in which judgment of court may be absolutely right by use of science. In this kind of a situation *it seems intolerable for a court to permit an opposite result to be reached when the judgment may scientifically be one of of complete accuracy. For a court to permit the establishment of paternity in cases where it is scientifically impossible to arrive at that result would seem to be a great travesty on justice.*

". . . . . . . . . . . .

"There is, however, one case not involving paternity in which the blood of the defendant was admitted to show that it was of the same type as blood found upon the seat of a car for the purpose of identifying the accused as the man who committed the crime. *Commonwealth* v. *Statti*, 166 Pa. Super. 577 [73 A.2d 688]. This case was a prosecution for assault with intent to commit rape. The prosecutrix testified that she bit a finger of the assailant during the struggle in his automobile. Evidence that stains on the seat cover in the automobile were made by blood of the same type as defendant's was admitted over objections that the taking of blood from defendant's person was in violation of his privilege against self-incrimination. The Superior Court of Pennsylvania, Hirt, J., held that defendant's constitutional rights were not violated even if the sample of blood was taken without his consent. He also held that such evidence was properly admitted as a circumstance bearing on identification, and that admissibility was not affected by the fact that the type

of defendant's blood was common to 45 per cent of all people. It may well be argued that if the blood type could be used affirmatively to identify the accused in a criminal case, it is equally relevant and valuable in a paternity case, particularly if the blood is an infrequent type.

"    .    .    .    .    .    .    .    .    .    .    .

"In order to avail himself of the provisions of this Act, the *person desiring that the blood test be taken should make a motion to the court a reasonable time before the case is reached for hearing.* What is a reasonable time is left to the discretion of the trial court. The purpose of an early application for the test is to permit the results of the test to become known prior to the trial. If, for example, it would show that non-paternity existed, the whole case might be settled in a pre-trial hearing. At any event, it would point up the issues when the case was reached for hearing. It would also permit the taking of additional tests if there was any claim as to the inaccuracy of the one given. Should the test not eliminate the alleged father, but indicate that he could be the father, it might be determined in pre-trial whether such evidence involved such infrequency of the blood type as to justify the discretion of the court in admitting it. The provisions in the Act leave it to the discretion of the court as to what constitutes reasonable time, taking into consideration the facilities for examination." (Emphasis added.)

We are of the opinion that the application here was timely made, that the trial court, under the circumstances of this case, had the right to, and should have ordered the tests under proper supervision and adequate safeguards.

At the time of the motion in the trial court Linda had testified, at the preliminary examination, that she had never had sexual intercourse with any person other than her father. If that testimony were true then the blood test would show compatibility.

We are not unmindful of the fact that the trial court had the witnesses before him, observed them as they testified and otherwise viewed the overall trial. The trial judge stated at the time of the sentence that he had no question about the guilt of the defendant, and from a reading of the record in this case we can well see how he came to such a conclusion. It was a despicable and revolting offense which was committed upon Linda, and the guilty person should be brought to justice. We further believe, however, that there was a miscarriage of justice in refusing or neglecting to

proceed with the blood tests pursuant to the defendant's request in the first instance.

Judgment reversed and cause remanded for a new trial.

White, P. J., and Doran, J., concurred.

A petition for a rehearing was denied November 26, 1956, and respondent's petition for a hearing by the Supreme Court was denied December 12, 1956. Gibson, C. J., Shenk, J., and Spence, J., were of the opinion that the petition should be granted.