[Crim. No. 10515. Fourth Dist., Div. Two. July 11, 1980.]

THE PEOPLE, Plaintiff and Respondent, v.
PAUL CLYDE BROWNING, Defendant and Appellant.

COUNSEL

T. Roger Duncan, under appointment by the Court of Appeal, for Defendant and Appellant.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, Daniel J. Kremer, Assistant Attorney General, Harley D. Mayfield and M. Howard Wayne, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

GARDNER, P. J.—

### THE HOLDING

In this case we hold that a witness to a crime is entitled to the same Fourth Amendment protection afforded the defendant charged with the crime.

### AN OVERVIEW

The facts are really quite simple. The defendant is charged with having shot the victim, not once but several times. Unhappily for all concerned, the bullets remain in the victim's body. The defendant says that in order to secure a fair trial he wants an order that a doctor chop out these bullets for ballistic examination. No way, says the victim. I have my rights too—Fourth Amendment rights against intrusions into my body. Just because he is a defendant and I am a victim, doesn't mean that I must further endanger my life by major surgery just so he can receive a fair trial.

This in a few words tells the whole story. However, since legal and judicial tradition demand specificity, we proceed to the details.

### THE SHOOTOUT AT THE LONG BRANCH SALOON

The prosecution version:

One night the defendant and a Mr. Killen became engaged in a brawl over a pool game in the Long Branch Saloon—the Indio version, not the

Dodge City original. Mr. Smith, the bartender, broke it up. Defendant went to his car, obtained a pistol, returned to the Long Branch and promptly shot Mr. Smith—right through the heart. Then, he turned his attention to Mr. Killen. First, he shot Mr. Killen in the leg. As Mr. Killen attempted to crawl away, defendant pursued him and, in the idiom of the day, said, "You ain't dead yet, you motherfucker."[1] He then pumped four more rounds into Mr. Killen's body. One lodged in the liver, two in the chest or abdominal area and one in the wrist. The defendant then departed. Six .22 caliber casings were found on the floor. Evidence was adduced that the defendant had a .22 caliber pistol.

The defendant's version:

As might be expected, defendant's version of the shootout varies somewhat from the above. According to the defendant, he saw Mr. Killen handing a large sum of money to the bartender. Since this was a marked departure from the usual flow of money in a bar, he suspected that a narcotics transaction was taking place. He chided Mr. Killen for this. A fight broke out. Mr. Smith, the bartender, broke it up. The defendant went to his truck and was in the process of leaving when Mr. Killen emerged from the bar, grabbed him by the hair and hit him with a pistol. The defendant reached for his own pistol, a .32 caliber, and began firing it at Mr. Killen. He hit Mr. Killen in the shoulder and leg. Mr. Killen then started shooting his pistol and backed into the bar still blasting away. The defendant fled and discarded his gun. It is obvious by this time from either or both versions that neither the defendant nor Mr. Killen was any Matt Dillon.

The jury was unimpressed with defendant's version. He was convicted of second degree murder (Mr. Smith) and assault with a deadly weapon (Mr. Killen). Use allegations were found to be true.

### THE PROBLEM

Sometime after the shooting, a bullet worked its way to the surface of Mr. Killen's wrist and was removed. It was .22 caliber. So was the bullet in Mr. Smith's heart. A ballistics examination was somewhat inconclusive. These bullets were apparently both .22 caliber but were too badly damaged to establish with a certainty that they came from

[1]See *People* v. *Benton* (1978) 77 Cal.App.3d 322, 324, footnote 1 [142 Cal.Rptr. 545].

the same gun although the ballistics expert opined that they probably did.

Since the defendant claimed that he was armed with a .32 caliber, he wanted the rest of the bullets removed from Mr. Killen's body. His theory was that if these were .32s, then Mr. Smith was accidentally killed by Mr. Killen as he backed into the bar while shooting at the defendant with his .22. Additionally, substance would then be given to the defendant's version of the assault with a deadly weapon, i.e., that he was only defending himself against Mr. Killen. He points out that all the witnesses had been drinking. This, of course, comes as no particular surprise considering the setting. He also contends that there are varying versions as to just how many shots were fired. Again, this comes as no surprise since one involved as a witness in a shooting foray is seldom inclined to spend much time counting the number of shots being fired. One is more inclined to assume a fetal position on the floor with eyes closed and hands over the ears. Nevertheless, while all of this may not be the greatest defense in judicial history, it was the defendant's defense and he was entitled to present it as vigorously and convincingly as possible.

In order to establish that defense, the defendant made a motion (1) that Mr. Killen submit to surgery for the removal of one or more of the bullets in his body, or in the alternative, (2) that the murder charge be dismissed and (3) that all ballistic evidence be excluded and the charge of the use of a gun be dismissed. The trial court denied the motion in its entirety. We affirm.

### The Fourth Amendment Rights of a Witness or a Victim

Understandably, there is a dearth of authority as to the Fourth Amendment rights of law-abiding citizens since they seldom experience any severe confrontation with authority and thus seldom have occasion to exercise those rights through the courts.

So, for guidance on the limitations on governmental intrusion into the privacy of the human body, we turn to those cases which have protected the bodies of criminal defendants from such intrusion.

Unhappily for our purposes, most of these cases, while consistently expressing a high degree of indignation at the tactics of the police and the brutality of the means used, usually proscribe the intrusion beneath

the body surface on due process grounds granted by the Fifth and Fourteenth Amendments. Typical of this genre are *Rochin* v. *California* (1952) 342 U.S. 165 [96 L.Ed. 183, 72 S.Ct. 205, 25 A.L.R.2d 1396], and cases collected in Witkin, California Evidence (2d ed. 1966) sections 906-907. (Cf. *People* v. *Bracamonte* (1975) 15 Cal.3d 394 [124 Cal.Rptr. 528, 540 P.2d 624].) However, as indicated, these cases are basically due process cases. Therefore, since Mr. Killen has been charged with nothing his due process rights are those of a witness—whatever those may be. Therefore, this line of cases affords him a rather shaky ground on which to protect himself from the surgical onslaught proposed by the defendant.

However, in *People* v. *Scott* (1978) 21 Cal.3d 284 [145 Cal.Rptr. 876, 578 P.2d 123], our Supreme Court came out four square on Fourth Amendment grounds against unreasonable body intrusions. Scott was charged with incest. The victim had contracted trichomoniasis, a type of venereal disease. The trial court ordered an examination of the defendant to ascertain whether he had the same disease—which is apparently communicable by sexual intercourse. The test consisted of the standard manual massage of the prostate gland via the rectum, an accepted and not particularly dangerous medical technique. The Supreme Court reversed on Fourth Amendment grounds, stating that the testing process violated the defendant's constitutional right to be protected against unreasonable searches. The court noted that while some minor routine tests such as a blood test (*People* v. *Superior Court* (*Hawkins*) (1972) 6 Cal.3d 757 [100 Cal.Rptr. 281, 493 P.2d 1145]) were acceptable, the Fourth Amendment's "particular solicitude" for "'personal dignity and privacy'" preclude any intrusion such as the prostate massage "[i]nvolving as it did the most intimate of bodily functions, traditionally and universally regarded as private...." (*Scott, supra,* at pp. 292-294.)

It appears to us that simple considerations of common sense and fair play would indicate that Mr. Killen should be entitled to at least the same Fourth Amendment protection as was the defendant in *Scott*.

However, when the courts have been faced with the problems of intrusion into the body or privacy of witnesses or victims to crime, there seems to have developed an attitude resting uncomfortably somewhere between studied indifference and benign neglect. For example, in *People* v. *Bynon* (1956) 146 Cal.App.2d 7 [303 P.2d 75], the court ordered a child victim in a Penal Code section 288 case to submit to a blood test

without a word as to the child's rights, simply assuming that as a part of criminal discovery, the child should submit to the removal of her blood on the basis that the results might be beneficial to the defense. The court merely said that it was the obligation of all citizens to support their government. As the result the practice has developed of ordering such minor unpleasantries as blood tests and vaginal examinations from victims of crime without any particular note having been made of the rights of these people to protest such bodily intrusions.

A more extreme example is to be found in *Ballard* v. *Superior Court* (1966) 64 Cal.2d 159 [49 Cal.Rptr. 302, 410 P.2d 838, 18 A.L.R.3d 1416]. *Ballard* upheld the power of the court to order a psychiatric examination of a complaining witness in a sex case. Admittedly, *Ballard* does not involve any bodily intrusion but one would think that a psychiatric examination which delves into the innermost secrets of a person's life would involve invasions into "personal dignity and privacy" comparable to if not greater than the prostate massage proscribed in *Scott.* This must be a matter of some concern to the women of the State of California. If a woman who has been raped has to submit to a psychiatric examination, why not a man who has been robbed. Fantasies are not limited to the female sex. Walter Mitty was no lady. However, on our level ours is not to question why. Nevertheless, we observe that by the use of a *Ballard* motion and a resulting psychiatric examination, any reasonably adroit lawyer can easily circumvent the provisions of Evidence Code section 1103 and parade the sex life of the victim before the jury. It is small wonder that the percentage of reported rapes is considerably less than the percentage of reported robberies.

The only case we have been able to unearth which deals with the rights of anyone other than a defendant in a criminal action is an opinion of this court, *People* v. *Vick* (1970) 11 Cal.App.3d 1058 [90 Cal.Rptr. 236]. *Vick* addressed itself to the rights of the family of the victim of a murder. The defendant was being prosecuted for murder. The body of the victim was released to the victim's family which promptly cremated it. The defendant subsequently sought an independent postmortem examination of the body by his own expert. Since cremation had precluded that possibility, the defendant moved to dismiss the murder charge. The trial court denied the motion and this court affirmed. The court held that while courts have permitted defendants to examine specimens and samples from the bodies of human beings that grant is based on judicial discretion and not constitutional right. Having made that contribution to judicial literature, the court

concluded: "There is a clear distinction between examination of physical evidence such as handwriting exemplars, fingerprints, written statements, and the body of a human being. The former are susceptible of examination without the likelihood of outrage to the emotional feelings of the living. As reflected in our laws, our society extends more respect to a dead body than to other physical evidence. [Citation.] While the state has no interest in the denial of the type of discovery sought herein, further outrage to the family of the victim may be prevented by such denial. [Citation.]" (*Vick, supra*, at pp. 1064-1065.)[2]

However, comforting though that language may be to the families of victims of homicide, it is of doubtful application to our problem inasmuch as Mr. Killen is alive and as well as anyone can be who is walking around with four bullets in his body. Nevertheless, it reflects some sensitivity to the rights of others than defendants who are involved in our administration of criminal justice.

It is our conclusion that witnesses should have, and we hold they do have, the same Fourth Amendment protection against governmental intrusion into their bodies that defendants in criminal cases have.

We then return to *Scott* for the standard to be applied. *Scott* established a balancing test as follows: "We therefore hold that where a warrant authorizing a bodily intrusion is sought, the issuing authority after finding probable cause to believe the intrusion will reveal evidence of crime, must apply an additional balancing test to determine whether the character of the requested search is appropriate. Factors which must be considered include the reliability of the method to be employed, the seriousness of the underlying criminal offense and society's consequent interest in obtaining a conviction [citations], the strength of law enforcement suspicions that evidence of crime will be revealed, the importance of the evidence sought, and the possibility that the evidence may be recovered by alternative means less violative of Fourth Amendment freedoms. [Citation.]

"These considerations must, in turn, be balanced against the severity of the proposed intrusion. Thus, the more intense, unusual, prolonged,

---

[2]This court seems to have a ghoulish interest in dead bodies. (See *Allen* v. *Jones* (1980) 104 Cal.App.3d 207 [163 Cal.Rptr. 445].)

uncomfortable, unsafe or undignified the procedure contemplated, or the more it intrudes upon essential standards of privacy, the greater must be the showing for the procedure's necessity." (*Scott, supra,* at p. 293.)

Applying this test (when applicable) to this case, we hold that the proposed surgery on Mr. Killen would be an unreasonable intrusion into his body which is proscribed under the Fourth Amendment.

### THE FOURTH AMENDMENT VS. THE FOURTEENTH AMENDMENT

Having determined that Mr. Killen is entitled to Fourth Amendment protection against the proposed surgery, we then face the conflict between that right and the defendant's right to due process and a fair trial under the Fourteenth Amendment.

Defendant proposes to protect his right to a fair trial which is being hampered by Mr. Killen's aversion to surgery by two sanctions—(1) dismissal of the murder charge involving Mr. Smith, and (2) dismissal of the gun use charge involving Mr. Killen. We feel that these proposed sanctions are much too Draconian.

The fact that relevant and material evidence may not be available to the defense, does not necessarily mean that there has been a denial of principles of due process. For example, an eyewitness to a crime may, on grounds of self-incrimination, refuse to answer questions aimed at absolving the defendant. The fact that this evidence is unavailable and that it might benefit the defendant is not a denial of due process. Again, we look to the Supreme Court for guidance and find it buried on page 177 of *Ballard, supra*: "The complaining witness should not, and realistically cannot, be forced to submit to a psychiatric examination or to cooperate with a psychiatrist. In the event that the witness thus refuses to cooperate, however, a comment on that refusal should be permitted."

Thus, it appears that the sanctions appropriate for the exercise by Mr. Killen of his Fourth Amendment rights would be the right on the part of the defendant to comment on Mr. Killen's refusal to cooperate with the proposed surgery, not the dismissal of a serious criminal charge.

### FERGUSON AND BRADY

Defendant attempts to bring himself under the umbrella of such cases as *Brady* v. *Maryland* (1963) 373 U.S. 83 [10 L.Ed.2d 215, 83 S.Ct. 1194]; and *In re Ferguson* (1971) 5 Cal.3d 525 [96 Cal.Rptr. 594, 487 P.2d 1234], which hold that it is improper for the prosecution to withhold evidence. That effort fails. Here the prosecution is not withholding anything. These bullets are in the possession of Mr. Killen and his possessory interest is somewhat less than transferable. This case is in no way similar to *People* v. *Davis* (1971) 20 Cal.App.3d 890 [98 Cal.Rptr. 71], in which the district attorney attempted, successfully, to induce the complaining witness to refuse a court-ordered psychiatric examination. Here, the district attorney wanted Mr. Killen to submit to surgery also. He, too, wanted the bullets—to show that they were .22 caliber.

### CONCLUSION

Thus, Mr. Killen may go his way with no further inconvenience from the presence of these bullets in his body other than the likelihood that he will encounter considerable embarrassment if he attempts to pass through the metal detection devices at airports which will undoubtedly light up like Fourth of July celebrations when he passes through.

Judgment affirmed.

Morris, J., and Mortland, J.,* concurred.

Appellant's petition for a hearing by the Supreme Court was denied October 8, 1980.

---

*Assigned by the Chairperson of the Judicial Council.