[No. F005817. Fifth Dist. July 17, 1986.]

THE PEOPLE, Plaintiff and Appellant, v.
BRAD NOKES et al., Defendants and Respondents.

470

**COUNSEL**

John K. Van de Kamp, Attorney General, Eddie T. Keller and Gelacio L. Bayani, Deputy Attorneys General, for Plaintiff and Appellant.

Simrin & Moloughney, Stanley Simrin and Rod Williams for Defendants and Respondents.

## OPINION

## HAMLIN, J.—

### STATEMENT OF THE CASE

Following a preliminary hearing, defendants Brad Nokes and Mary Nokes were charged with committing, by use of force or threat of great bodily harm, 133 counts of lewd and lascivious acts with a child under age 14 (Pen. Code, § 288, subd. (b)).[1] All of the acts allegedly occurred between April 1, 1984, and June 26, 1984.

Twenty-eight counts named six-year-old Melissa G. as the victim; twenty-two counts named Melissa's four-year-old brother, Tyson G.; nineteen counts named defendants' nine-year-old son; thirty-six counts named defendants' seven-year-old daughter; four counts named seven-year-old Suzanne G.; thirteen counts named five-year-old Crystal P.; and eleven counts named five-year-old Carrie B.[2] In some of the counts one of the defendants was alleged to be the actual perpetrator while the other aided and abetted; in other counts a third person was alleged to be the actual perpetrator, and both defendants were charged as aiders and abettors. Defendant Brad Nokes alone was charged with attempting to dissuade a witness (his son) from testifying. (§ 136.1, subd. (c)(1).)

On April 4, 1985, defendant Brad Nokes filed a section 995 motion, in which defendant Mary Nokes joined, to set aside the information on the basis defendants had been denied a substantial right at the preliminary hearing and therefore had not been legally committed. The underlying issue was the magistrate's denial of a defense motion that defendants' children be ordered to submit to physical examinations, vaginal and/or anal. Although the daughter had testified, her testimony incriminated no one; all charges against defendants rested on the testimony of the son and of Melissa. Defendants claimed that denial of their motion for a physical examination of two of the alleged victims prevented them from presenting a defense.

The trial court granted defendants' motion; the People appeal, contending that the magistrate's denial of defendants' motion for a physical examination did not deprive defendants of a substantial right, and, in the alternative, that dismissal was too drastic a remedy. We find, contrary to the trial court's conclusion, the magistrate did not abuse his discretion in denying defendants' motion for physical examinations. Thus the trial court improperly granted

---

[1] All statutory references are to the Penal Code unless otherwise indicated.

[2] Each of the victims is hereafter referred to by his or her first name except that defendants' children are referred to individually as the son or the daughter.

defendants' section 995 motion; we will therefore reverse the judgment of dismissal.

## STATEMENT OF THE FACTS

Because defendants' section 995 motion was based on the alleged illegality of their commitments and not on insufficiency of the evidence, we limit our statement of the facts to a summary of the testimony of the three principal witnesses.

Melissa testified defendants and their children were visiting at her family's home when "some bad things" happened to her. She was six years old at the time the bad things first happened. Melissa, her younger brother Tyson and defendants' children were playing in Melissa's bedroom when defendants and Melissa's parents came in. At the direction of Melissa's mother the children took off their clothes; Melissa's father and defendant Brad Nokes also undressed, but the mothers did not. Melissa's mother put ropes on the children's ankles and wrists and gave each child a pill. Melissa said the pill made her feel tired.

Thereafter, according to Melissa, defendant Brad Nokes penetrated her vagina and anus with his penis. That hurt and caused her to cry. He did the same thing to his daughter, who was also crying. He then penetrated both Tyson and his son anally with his penis and caused Tyson to cry. Defendant Mary Nokes penetrated Melissa and her daughter vaginally and anally using her fingers; she also penetrated Tyson and her son anally in a similar way. Melissa's father then molested defendants' children the same way defendant Brad Nokes had molested them, and Melissa's mother molested defendants' children just as defendant Mary Nokes had. When Melissa's mother was not molesting one of the children, she was photographing the activity with a Polaroid camera, a chore taken over by her husband when she was otherwise occupied. Melissa's parents told all the children not to tell, and they specifically told Melissa she would get a spanking if she told.

Melissa testified to a second, similar occurrence involving the same children, the same adults, substantially the same activities, and the same warnings at the conclusion.

Although Melissa's testimony held up virtually without variance during cross-examination on the first day (the same day as her direct examination), when cross-examination resumed after a one-day continuance, Melissa testified for the first time about two other children who were present and victimized on the first occasion, Suzanne and Crystal. Additionally, counsel elicited testimony from Melissa that all six children were on her "big" bed

at once, along with two or three of the adults engaged in simultaneous acts of molestation. Melissa also testified on cross-examination, although not in great detail, about a third occasion of molestation, about a week after the first two, when similar acts occurred but rather than being tied with ropes, Melissa had been handcuffed.

The son's testimony was generally consistent with Melissa's in describing the molestation which occurred at the residence of Melissa and Tyson's parents. However, he did contradict Melissa's testimony in two notable particulars: (1) he denied ropes were used, testifying instead that the children on at least one occasion were handcuffed to a board; and (2) he testified the children were given shots, not pills.

The son also testified that his parents took him and his sister to Disneyland a few months before the preliminary hearing. He stated his parents were afraid they were going to be arrested and left town to get away from the police. They had warned him he might get hurt if he told anyone about what had happened. Defendant Brad Nokes made his threat more specific by relating it to Space Mountain, a roller coaster ride, and how he would "mess up" the ride and cause the children to fall off. He also held a knife on one occasion when he threatened his children.

The daughter was called to testify on behalf of her father, defendant Brad Nokes. To virtually all material questions asked by any attorney, or by the magistrate, the daughter responded, "I don't remember" or "I don't know." On redirect examination by counsel for defendant Brad Nokes, when asked who in the courtroom she was afraid of, the daughter replied, "[m]y mom and dad." She could not tell counsel why nor when she started being afraid of her parents, but when asked if she would be able to tell more if they were not in the courtroom, the daughter replied, "[y]es." After the daughter was excused, the magistrate commented on the record that she was constantly looking down, that she was playing with her sandals or her socks, and that she was "[o]bviously very uncomfortable in the courtroom."

## DISCUSSION

Defense counsel moved for a physical examination of the son when, during his cross-examination, it became clear he had not been examined by a physician in connection with his allegations that he had been sexually abused. Although the magistrate initially denied this motion as untimely, further argument on that issue convinced him that the son's testimony was the first indication to defense counsel of the son's claim that he had been sodomized. The magistrate therefore agreed to hear the motion. Before the hearing, the court consulted Jay Smith, the attorney appointed to represent defendants'

children in a juvenile court dependency proceeding. Smith indicated he had talked briefly to the son concerning the proposed examination and the son was unwilling to have such an examination. Smith then requested that he be given notice of any future hearing on the defense motion and an opportunity to oppose the motion on the son's behalf.

At the later hearing on defendants' motion for physical examinations, Smith stated, "I talked to [the son] just about whether or not he was concerned or upset about the possibility of a medical examination. He said that he was. He said that—we did not get into the details of it but basically a kind of examination that would be an examination of his bottom would make him think of what he'd gone through before. [¶] He was concerned about that. He thought he would feel emotionally upset if that happened. . . . [¶] . . . [The son] was firm, said to me in his own words that he was very upset about the idea of the examination, that's why I appeared in court and asked for an opportunity to oppose it." Smith further explained that he had talked to the son about the possibility his unwillingness to have the examination would adversely affect his credibility, "might be taken as saying you're not telling the truth. He [the son] said I am telling the truth but I don't want to go through the examination." Smith acknowledged he had not spoken to the daughter about the proposed examination since he was unaware the motion extended to her.

In support of their motion, defendants offered two reports prepared by Dr. Jess Diamond, head of pediatrics at Kern Medical Center, who had testified in several child molestation cases. Dr. Diamond was the physician whom defense counsel proposed to conduct the examinations of defendants' children. He had already examined some of the children alleged to have been molested by defendants; the medical reports offered by defendants were those of Crystal and Suzanne. The magistrate stated for the record that he had contacted Dr. Diamond prior to the hearing and discussed with him the validity of the proposed examination based on a hypothetical drawn from the evidence presented at the preliminary hearing. The magistrate then called Dr. Diamond as the court's own witness, and Dr. Diamond testified from hypotheticals presented by the court, by defense counsel, and by the prosecutor. Based on that testimony and the other evidence before him, the magistrate concluded that (1) any results of physical examinations of the children could not exculpate defendants and (2) under the facts of this case the son's expressed reluctance rendered the proposed bodily intrusion too great. The magistrate therefore denied defendants' motion in reliance on section 288, subdivision (c) and *People* v. *Scott* (1978) 21 Cal.3d 284 [145 Cal.Rptr. 876, 578 P.2d 123].

Relying primarily on the same authority, the trial court concluded (1) that the magistrate abused his discretion in denying defendants' motion for

a physical examination of defendants' children, (2) that this denial operated to preclude defendants from presenting an affirmative defense at the preliminary hearing, and (3) that this denial of a substantial right rendered defendants' ensuing commitment illegal. The trial court then dismissed the entire information.

Although this is the People's appeal, the logical starting point for an analysis of the pivotal issue is the argument offered by defendants in support of the trial court's ruling. Specifically, defendants contend that if they were denied a substantial right at the preliminary hearing any ensuing commitment is illegal and subject to dismissal under the provisions of section 995. Defendants then contend their right to present an affirmative defense at the preliminary hearing is such a substantial right, the denial of which entitles them to dismissal. To make meaningful their right to present an affirmative defense, defendants argue they have a corresponding right to discovery prior to or at the preliminary hearing, although acknowledging that any such right to discovery is within the traditional discretionary limits vested in the trial court. Finally, defendants contend the magistrate abused his discretion in denying their motion for physical examinations of the victims, thus abridging their right to present an affirmative defense and setting in motion the means by which the information was set aside by the trial court.

Defendants' arguments require us to decide whether or not the magistrate did, in fact, abuse his discretion in denying defendants' motions for physical examinations of defendants' children. The alleged abuse of discretion is the foundation on which defendants' entire argument rests.

A. *Standard of Review.*

The People contend the standard by which we review the trial court's ruling on defendants' section 995 motion is controlled by *People* v. *Laiwa* (1983) 34 Cal.3d 711 [195 Cal.Rptr. 503, 669 P.2d 1278]. We agree.

In *Laiwa,* our Supreme Court first described the factfinding powers of the superior court in a section 1538.5 proceeding and the related limitation of appellate review to that of substantial evidence supporting the trial court. It then stated: "By contrast, in proceedings under section 995 it is the magistrate who is the finder of fact; the superior court has none of the foregoing powers, and sits merely as a reviewing court; it must draw every legitimate inference in favor of the information, and cannot substitute its judgment as to the credibility or weight of the evidence for that of the magistrate. [Citation.] On review by appeal or writ, moreover, the appellate court in effect disregards the ruling of the superior court and directly reviews

the determination of the magistrate holding the defendant to answer. [Citations.]" (*People* v. *Laiwa, supra,* at p. 718.)

Factually, the decision in *People* v. *Laiwa, supra,* addressed a motion to set aside an information based on lack of sufficient evidence to warrant holding the defendant to answer. This is but one of two grounds by which an information may be set aside pursuant to section 995; the second provides that an information shall be set aside if it is shown that before the filing of the information the defendant had not been legally committed by a magistrate. (§ 995, subd. (a)(2)(A).) We have found no case which specifically adapts the standard defined in *People* v. *Laiwa, supra,* to a case in which the basis for a section 995 motion is the alleged illegality of the commitment. However, in *People* v. *Flemmings* (1973) 34 Cal.App.3d 63, 67 [109 Cal.Rptr. 661], the court held that the focus of appellate inquiry is "whether the defendant was prejudiced or deprived of a substantial right at the preliminary examination." (See also *Mitchell* v. *Superior Court* (1958) 50 Cal.2d 827, 829-830 [330 P.2d 48].) Like the rule affirmed in *People* v. *Laiwa, supra, Flemmings* indicates the role of this court is to determine whether the magistrate's denial of defendants' motion prejudiced them or deprived them of a substantial right at the preliminary hearing. This court is not limited to ascertaining whether substantial evidence supported the decision of the trial court to grant defendants' section 995 motion.

B. *Discretion to Withhold Authorization of Bodily Intrusions.*

In assessing the magistrate's exercise of discretion in denying defendants' motion for physical examinations of the children, the People and defendants agree the seminal case in the area of court-ordered physical examinations is *People* v. *Scott, supra,* 21 Cal.3d 284. In *Scott* the People sought and the trial court ordered the defendant to submit to a particular medical technique designed to elicit evidence that defendant suffered from the same sexually transmitted disease which had been diagnosed in the daughter the defendant was accused of molesting. The examination involved "a prolonged massage of the prostate gland, through the rectum, to induce involuntary ejaculation." (*Id.,* at p. 294.) Although the Supreme Court rejected the defendant's claim that this examination violated his constitutional right to be free from self-incrimination, it concluded the test did violate the defendant's constitutional right to be protected from unreasonable searches. The court in *Scott* established a two-step inquiry in determining the justification for a judicially authorized intrusion into the human body. Initially, the court which has been asked to order the intrusion must be convinced there is at least probable cause that relevant evidence will be obtained.

And, even if the court is satisfied that probable cause exists to justify intrusion into the body, it must still engage in a balancing test "to determine whether the character of the requested search is appropriate." (*Id.,* at p. 293.) The court then outlined those factors to be considered in making such a determination: "Factors which must be considered include the reliability of the method to be employed, the seriousness of the underlying criminal offense and society's consequent interest in obtaining a conviction [citations], the strength of law enforcement suspicions that evidence of crime will be revealed, the importance of the evidence sought, and the possibility that the evidence may be recovered by alternative means less violative of Fourth Amendment freedoms. [Citation.]

"These considerations must, in turn, be balanced against the severity of the proposed intrusion. Thus, the more intense, unusual, prolonged, uncomfortable, unsafe or undignified the procedure contemplated, or the more it intrudes upon essential standards of privacy, the greater must be the showing for the procedure's necessity." (*Ibid.*) ▪▪▪ In applying those factors to the case before it, the Supreme Court concluded that the examination in *Scott,* described above, violated constitutional standards not only because it was extreme, "[i]nvolving as it did the most intimate of bodily functions, traditionally and universally regarded as private" (*id.,* at p. 294), but also because the only evidence which could be gleaned from such a test "though possibly 'relevant' in the broadest sense of the term . . ., was highly circumstantial and speculative." (*Ibid.*) Because the Supreme Court determined that the erroneous admission of the test results in *Scott* could not be deemed harmless beyond a reasonable doubt, the conviction was reversed.

In *People* v. *Browning* (1980) 108 Cal.App.3d 117, 124 [166 Cal.Rptr. 293], the court concluded "that witnesses should have, and we hold they do have, the same Fourth Amendment protection against governmental intrusion into their bodies that defendants in criminal cases have." The court went on to utilize the *Scott* criteria to dispose of both of the defendant's contentions. First, the court concluded that the trial court properly denied the defendant's motion to require the victim of a shooting to submit to surgery for the removal of one or more of the bullets which remained in his body. It then denied the defendant's alternative motion to dismiss the murder charge and to exclude any ballistic evidence in other counts. The court specifically recognized several sanctions available to the defendant under these circumstances to avoid the Draconian sanction of dismissal. (*Id.,* at pp. 125-126; see also *Mendibles* v. *Superior Court* (1984) 162 Cal.App.3d 1191 [208 Cal.Rptr. 841].)

The results reached in *People* v. *Scott, supra,* and *People* v. *Browning, supra,* are consistent with recent decisions of the United States Supreme

Court in *Winston* v. *Lee* (1985) 470 U.S. 753 [84 L.Ed.2d 662, 105 S.Ct. 1611] and *United States* v. *Montoya de Hernandez* (1985) 473 U.S. 531 [87 L.Ed.2d 381, 105 S.Ct. 3304]. Although the surgery sought by the state to remove a bullet was deemed an unreasonable search in *Winston* v. *Lee, supra,* while the prolonged detention at the border of a suspected drug smuggler until nature forced disclosure of the evidence carried in her alimentary canal was upheld in *United States* v. *Montoya de Hernandez, supra,* both cases made clear that the individualized circumstances of the particular search were determinative. ■ That is to say, the reasonableness of a search under the Fourth Amendment is to be gauged by the particular facts in the case under consideration; no hard and fast rule can be formulated to cover all possible contingencies nor can individual factors be segregated from the totality of the circumstances and declared reasonable or unreasonable for purposes of future searches.

■ We find nothing in the cited cases to suggest that a criminal defendant has the right to compel an intrusion into the body of his or her victim for the purpose of attempting to obtain allegedly exculpatory evidence. In fact, the cases are all to the contrary. ■ Here, defendants' proposed intrusion into the bodies of their children was not based on right but was within the discretion of the magistrate to order or not, governed by the principles reviewed. The fallacy in defendants' brief lies in obscuring the distinction between their *right* to present an affirmative defense at the preliminary hearing, admittedly a substantial right, and the *opportunity* to obtain evidence allegedly necessary to assert this defense, erroneously characterized by defendants as a right to such evidence.

The magistrate in this case not only applied the appropriate criteria from *Scott* in considering defendants' motion but did so in such a manner that the focus of his inquiry was the defendants' interest in obtaining the results of physical examinations of the children rather than any interest asserted by the People. Thus, the magistrate explained: "To allay Mr. Simrin's fears with regard to those considerations, I have reversed certain requirements for where it talks about society's consequent interest in obtaining a conviction I have inserted society's interest in obtaining an acquittal in appropriate circumstances.

"Also where it says strength of law enforcement suspicions that evidence of a crime will be revealed substituting in there the strength of defense suspicions that evidence of a crime will be contradicted.

"So I am reading that in such a way to take the defendants' rights in mind."

Defendants have objected to the significance the magistrate placed on section 288, subdivision (c), added to the Penal Code in 1982. It provides, "In any arrest or prosecution under this section the peace officer, the district attorney, and the court shall consider the needs of the child victim and shall do whatever is necessary and constitutionally permissible to prevent psychological harm to the child victim." Defendants contend this statute could not be used by the magistrate to defeat their constitutional right to put on an affirmative defense. Again this argument mistakenly assumes defendants' right to present an affirmative defense at the preliminary hearing somehow transforms their right to *seek* discovery into an absolute right to discovery, of equal constitutional force. ■ In *Holman* v. *Superior Court* (1981) 29 Cal.3d 480, 483 [174 Cal.Rptr. 506, 629 P.2d 14], our Supreme Court discussed the origin of and the limitation on the right to seek discovery as follows: "As a general proposition, we have said that 'the right of an accused to seek discovery in the course of preparing his defense to a criminal prosecution is a judicially created doctrine evolving in the absence of guiding legislation. [Citations.] A defendant's motion to discover is addressed solely to the sound discretion of the trial court, which has the inherent power to order discovery when the interests of justice so demand. [Citations.]' [Citation.]" Thus the magistrate erred only if he abused his discretion in denying defendants' motion to compel their children to submit to physical examinations.

■ In determining whether the magistrate abused his discretion, we note first that any genital or rectal examination has a vastly higher privacy quotient than examination of the eyes, the hair, the throat, or the extremities, for example. Since the Fourth Amendment requires that the reasonableness of a proposed bodily intrusion be determined in light of all the circumstances of a particular case, the magistrate properly considered as a factor in assessing the proposed intrusion the potential for psychological harm to the son.

Although the procedure proposed to be utilized in a rectal examination of the son was fairly simple and would be carried out by Dr. Diamond with all possible regard for the son's well-being, an examination encompassing the insertion of a finger into the son's rectum could not be characterized as simple and nontraumatic for him. Given the nature of the son's testimony, the subject of the examination in this case would be a nine-year-old boy who had already been molested on repeated occasions by the insertion of a finger into his anus. This aspect of the proposed examination necessarily takes on different proportions for the son than it would for someone without his particular background.

We are not persuaded that our recognition of the magistrate's discretion to deny a physical examination such as defendants seek in this case results

in a double standard. Defendants argue that evidence of a physical examination has been produced in many other cases, often by the People, without anything to indicate whether the child willingly submitted to the examination. While that may be true, the objective results of such an examination are available to the defendant for review and comment by defense experts. The problem touched upon by the trial court—that in an unfortunate number of these cases, the child has been made a ward of the juvenile court based on charges against both parents or the only custodial parent—arises when the People obtain an examination with the consent of the juvenile court, acting in loco parentis. Yet this situation is really no different from that which occurs when the prosecution asks the parent to have the child examined; once the examination had been made and the results made available to the People as criminal prosecutor, the defense has an equal right to the results under standard rules of criminal discovery. We discern no unfairness or inequity in this procedure.

As defendants point out, and as the trial court recognized in ruling on defendants' section 995 motion, the daughter had not expressed any objection to the examination, simply because she had not been questioned about it. However, it was not merely the son's objection to the examination on which the magistrate rested his denial of defendants' motion. Dr. Diamond's testimony was clear that while signs of scarring from old tears would be positive evidence that the child had been molested, the absence of such evidence, i.e., normal results of an examination, would not establish that the child had not been molested. Thus, while the method of examination may have been reliable in the abstract, the reliability of the examination with respect to defendants' right to present an affirmative defense was virtually nonexistent. If the examination showed positive evidence of molestation, that finding would hardly be helpful to defendants. Moreover, even if the examination failed to show any affirmative evidence of molestation, this would not lead to a finding that the molestation had not occurred, nor even that the children's description of what happened was erroneous. This equivocal nature of such examinations is evidenced by the letters detailing Dr. Diamond's examinations of Suzanne and Crystal. Suzanne's examination was normal both vaginally and anally, and although Crystal's vaginal examination did show evidence of a torn, but healed, hymen, her rectal examination was normal. Yet the magistrate held defendants to answer for the molestation of both Suzanne and Crystal, a finding to which defendants have lodged no objection based on insufficiency of the evidence to sustain their commitment.

The nature of the discovery sought in the instant case differed in kind, not merely in degree, from the discovery in those cases on which defendants have relied. For example, in *People* v. *Hertz* (1980) 103 Cal.App.3d 770

[163 Cal.Rptr. 233], defendants sought to assert an affirmative defense of discriminatory enforcement, and in support of that defense they sought information contained in police intelligence files. Following an *unreported* in camera hearing, the magistrate found 11 of 21 sought-after items to be privileged pursuant to portions of the Government Code, did not retain these records under court seal, and curtailed cross-examination of police officers about matters contained in those records. Interestingly enough, it was the failure of the magistrate to make an adequate record for appellate review which underscored the affirmance of dismissal pursuant to section 995. In *Miller* v. *Superior Court* (1979) 99 Cal.App.3d 381 [159 Cal.Rptr. 456] the defendant sought an order requiring the People to disclose the address of a witness-informant to permit him to ascertain the informant's reputation for honesty in the community. *Despite* the failure of the People to establish cause for withholding the address, the magistrate refused the order. This refusal led to dismissal of the charges. Finally, in *People* v. *Iocca* (1974) 37 Cal.App.3d 73 [112 Cal.Rptr. 102] dismissal of the charges was affirmed following the magistrate's denial of a continuance sought in order to permit defendants to locate a witness allegedly necessary for their defense of entrapment.

In none of these cases was the discovery sought as intrusive as the medical examinations of child victims of molestation which are at issue here. The court noted in *People* v. *Iocca, supra,* 37 Cal.App.3d 73 that there was nothing to indicate the defendants had been less than diligent in seeking to locate the material witness; in *Miller* v. *Superior Court, supra,* 99 Cal.App.3d 381 the People failed to support their claim that the informant-witness must be kept confidential. While both cases rested upon the defendant's *right* to present an affirmative defense, the cases make clear that this "right" is still subject to traditional guidelines governing discovery. In the case before this court, the guidelines are those set forth in *People* v. *Scott, supra,* 21 Cal.3d 284 and discussed above.

Defendants argue that an exercise of discretion is measured merely by counting the factors on one side, counting the factors on the other side, and inflexibly exercising discretion in favor of the greater accumulation. This mistakes the nature of discretion, an error emphasized by the trial court's conclusion, in granting defendants' section 995 motion, that if any case warranted such court-ordered examinations, this was the case. The exercise of discretion to refuse to compel a child victim to submit to a physical examination when the examination could at best produce results equivocal on a defendant's "innocence" should not be disturbed unless the exercise of discretion has been so arbitrary and capricious that no reasonable court could have made such a finding. This is not such a case.

Admittedly, the magistrate's binding over of defendants rested solely on the testimony of the son and of Melissa, testimony which was not entirely consistent. Yet the magistrate made clear that his commitment order was based upon his determination that he found the children credible. This is not, as defendants characterize it, a denial of their right to a preliminary hearing at which the magistrate weighs the evidence and the credibility of witnesses. The magistrate's opinion that the children were credible, considered with his finding that the examination would, at best, produce equivocal results and would subject the son, at least, to emotional harm in contravention of the mandate of section 288, subdivision (c), demonstrates a proper exercise of discretion in denying the examination. Since that is so, and defendants were not limited in their cross-examination of the children, we conclude defendants' argument that they were denied a substantial right in being precluded from presenting an affirmative defense lacks merit.

This conclusion makes it unnecessary to consider the People's alternative argument that even if the magistrate abused his discretion in denying defendants' motion for physical examinations, the trial court's remedy, dismissal of the entire action, was too drastic. We do note, however, that dismissal of all charges is the ultimate remedy and one rarely required. There are numerous less drastic remedies available to the trial court. (See, e.g., *Mendibles* v. *Superior Court, supra,* 162 Cal.App.3d at p. 1198; *People* v. *Browning, supra,* 108 Cal.App.3d at p. 125.)

The judgment of dismissal is reversed and the matter is remanded to the trial court for further proceedings.

Hanson (P. D.), Acting P. J., and Papadakis (V. N.), J.,* concurred.

A petition for a rehearing was denied August 6, 1986, and respondents' petition for review by the Supreme Court was denied October 16, 1986.

---

*Assigned by the Chairperson of the Judicial Council.