[No. A045336. First Dist., Div. Five. Mar. 20, 1990.]

JOHNETTA J., Petitioner, v.
THE MUNICIPAL COURT FOR THE SAN FRANCISCO
JUDICIAL DISTRICT OF THE CITY AND COUNTY OF SAN
FRANCISCO, Respondent;
SAN FRANCISCO SHERIFF'S DEPARTMENT, Real Party in
Interest.

COUNSEL

Jeff Brown, Public Defender, Peter G. Keane, Grace Lidia Suarez, William Heckman and Ron Albers, Deputy Public Defenders, for Petitioner.

Rochelle D. Alpert, Kathleen V. Fisher, Ruth N. Borenstein, Frank A. McGuire, Maia Ettinger, Morrison & Foerster, Matthew A. Coles, Margaret C. Crosby, Alan L. Schlosser, Edward M. Chen, John Davidson and Paul Hoffman as Amici Curiae on behalf of Petitioner.

No appearance for Respondent.

Louise H. Renne, City Attorney, Burk E. Deleventhal, Randy Riddle and Paula Jesson, Deputy City Attorneys, and James F. Harrigan for Real Party In Interest.

## OPINION

## HANING, J.—

### INTRODUCTION

Proposition 96 was enacted by the voters in the November 1988 general election. In this case we decide constitutional challenges to the initiative's major component, which provides for mandatory Acquired Immune Deficiency Syndrome (AIDS) blood testing for persons charged with interfering with the official duties of public safety employees when there is probable cause to believe the person's bodily fluids have mingled with those of the employee. We shall conclude that under the circumstances here presented—when such a person's saliva is transmitted to a public safety employee by means of a subcutaneous bite—the Proposition 96 blood testing scheme withstands constitutional challenges provided the nondisclosure provisions of the statute are strictly enforced.

Petitioner Johnetta J. seeks a writ of prohibition restraining respondent San Francisco Municipal Court from enforcing an order that petitioner submit to blood testing pursuant to Proposition 96, at the request of real party in interest San Francisco Sheriff's Department. Petitioner contends the mandatory testing scheme amounts to an unreasonable search and seizure (U.S. Const., Amendment IV; Cal. Const., art. I, § 3), and violates her right of privacy under the state constitution. (Cal. Const., art. I, § 1.) We have previously denied a stay of the test, and petitioner has submitted to the order. We have nevertheless chosen to decide the technically moot petition on its merits, because it raises questions of statewide concern. (*Sonoma County Nuclear Free Zone '86* v. *Superior Court* (1987) 189 Cal.App.3d 167 [234 Cal.Rptr. 357].)

FACTS

Petitioner allegedly became disruptive while attending a child dependency hearing in San Francisco Superior Court, and her conduct required her physical removal from the courtroom by the bailiff, a San Francisco sheriff's deputy. Petitioner became violent and assaulted the deputy, inflicting a deep bite on the deputy's arm which penetrated the skin and drew blood. As a result of the fracas, a complaint was filed in respondent court charging petitioner with felony assault with force likely to produce great bodily injury (Pen. Code, § 245, subd. (b)), felony assault on a peace officer (Pen. Code, § 243, subd. (c)), and misdemeanor interference with an officer. (Pen. Code, § 148.)

These charges triggered applicability of Proposition 96, codified as Health and Safety Code section 199.95[1] et seq., which comprise a new chapter 1.20 of part I of division I of the code, entitled "AIDS Public Safety and Testing Disclosure." AIDS is a fatal disease caused by the human immunodeficiency virus (HIV). HIV causes death by destroying T-helper cells, which the body's immune system uses to structure its defense against foreign disease-causing agents such as viruses and bacteria. HIV renders the body's immune system incapable of fighting disease; thus the HIV-infected person is relatively defenseless against many diseases which would not seriously endanger a healthy, noninfected person.

Proposition 96 covers three distinct situations involving possible transmission of AIDS: to the victim of a sex crime (§ 199.96); to an assaulted peace officer, firefighter or emergency medical technician (§ 199.97); and to an employee of a custodial facility (§ 199.99).

The initiative measure begins with a purpose clause: "The people of the State of California find and declare that AIDS, AIDS-related conditions, and other communicable diseases pose a major threat to the public health and safety. [¶] The health and safety of the public, victims of sexual crimes, and peace officers, firefighters and custodial personnel who may come into contact with infected persons, have not been adequately protected by law. *The purpose of this chapter is to require that information that may be vital to the health and safety of the public,* victims of certain crimes, certain defendants and minors, and custodial personnel, custodial medical personnel, *peace officers, firefighters and emergency medical personnel put at risk in the course of their official duties, be obtained and disclosed in an appropriate manner in order that precautions can be taken to preserve their health and*

---

[1] Ensuing statutory citations are to the Health and Safety Code unless otherwise indicated.

*the health of others or that such persons can be relieved from groundless fear of infection.*" (§ 199.95, italics added.)

The remainder of section 199.95 reads: "*It is the intent of this chapter to supersede in case of conflict existing statutes or case law on the subjects covered including but not limited to the confidentiality and consent provisions* contained in chapters 1.11, 1.12, and 1.13 of Part I of Division I of the Health and Safety Code." (Italics added.)

Section 199.97 reads, in pertinent part: "Any person charged in any criminal complaint filed with a magistrate or court . . . in which it is alleged in whole or in part that the defendant . . . interfered with the official duties of a peace officer . . . by biting . . . or transferring blood or other bodily fluids on, upon, or through the skin or membranes of a peace officer . . . shall in addition to any penalties provided by law be subject to an order of a court having jurisdiction of the complaint . . . requiring testing as provided in this chapter. [¶] The peace officer, . . . or the employing agency, officer, or entity may petition the court for an order authorized under this section. [¶] The court shall promptly conduct a hearing upon any such petition. *If the court finds that probable cause exists to believe that a possible transfer of blood, saliva, semen, or other bodily fluid took place between the defendant . . . and the peace officer . . . the court shall order that the defendant . . . provide two specimens of blood for testing* as provided in this chapter. . . ." (Italics added.)

The blood must be drawn in "a medically approved manner" and be tested by "a licensed medical laboratory." (§ 199.98, subds. (a), (b).) The blood is to be tested for "medically accepted indications of exposure to or infection by acquired immunity deficiency syndrome (AIDS) virus, AIDS-related conditions, and such communicable diseases for which medically approved testing is readily and economically available as determined by the court." (§ 199.98, subd. (b).)

"Copies of the test results shall be sent to the defendant . . . , each peace officer . . . named in the petition and his or her employing agency, officer, or entity, and if the defendant . . . is incarcerated . . . to the officer in charge and the chief medical officer of the facility in which such person is incarcerated . . . ." (§ 199.97.) "Copies of test results which indicate exposure to or infection by AIDS, AIDS-related conditions, or other communicable diseases shall also be transmitted to the State Department of Health Services." (§ 199.98, subd. (c).) "The court shall order all persons, other than the test subject, who receive test results" pursuant to section 199.97, "to maintain the confidentiality of personal identifying data relating to the

test results except for disclosure which may be necessary to obtain medical or psychological care or advice." (§ 199.98, subd. (e).)

Soon after the biting incident at issue herein, real party filed a motion under section 199.97 seeking an order for a test of petitioner's blood. The motion acknowledged that real party "is wholly without any information as to [petitioner's] susceptibility to an actual infection by Aids Virus, Aids related conditions or other communicable diseases." Real party attached to its motion two police reports of the bite incident, photographs of the bite, and a letter report to real party from Dr. Bradley Maring, the deputy's treating physician.

Dr. Maring's report described the bite as "a deep puncture type bite." It stated "[t]here was no blood in the mouth of [petitioner] at the time; but certainly saliva was transferred." It further stated that the AIDS virus "is in all bodily fluids, although in low concentrations in saliva. Theoretically, a transmission of the AIDS virus (HIV) could have occurred. No such transmission has been reported in the medical literature without blood present— but it is *theoretically* possible."

Petitioner opposed the motion on the grounds the statutory blood testing scheme violated the Fourth Amendment and the California constitutional right of privacy. In essence, petitioner's Fourth Amendment claim was premised on the contention that the bodily intrusion of forced blood testing can be justified only if there is at least probable cause that the intrusion will yield evidence of HIV infection. This led to a series of hearings in respondent court concerning the nature of AIDS and its transmission and the possibility of the transfer of HIV by saliva through biting.

At the first hearing, in addition to articles from medical journals petitioner presented the declarations of three experts on AIDS and its treatment: Dr. Marcus Conant, M.D.; Dr. Nancy Padian, Ph.D.; and Dr. Paul Volberding, M.D. Each declarant states that AIDS is spread three ways: "[1] sexually, [2] through blood or blood products, and [3] directly from mother to child [*in utero* and during parturition]." Given Dr. Maring's observation that none of petitioner's blood entered the deputy's bloodstream, the experts focused on the question whether saliva alone could transmit HIV. The experts declared that no case of HIV transmission by saliva has been reported, and no infections have been found in individuals exposed to the saliva of an infected person. These cases include studies of family members of AIDS patients who have kissed the patient and shared toothbrushes, drinking glasses, etc. "Researchers have found HIV in saliva in low concentrations, but those low concentrations, together with the studies described above and the absence of a single documented case of transmission are strong evidence

that HIV cannot be transmitted through saliva." This is close as the experts came to a categorical statement.

The declarations also note there have been no documented cases of AIDS transmission through biting. Categorical statements are again avoided, but Dr. Volberding goes so far as to state "there is no reason to think HIV is transmitted by biting."[2]

The declarations also give information on AIDS testing, beginning with the fact that AIDS testing is a test not for the HIV virus but for the antibodies the body creates in its attempt (ultimately futile) to destroy the virus. The antibodies are not developed until three to six months after infection, depending on the person. "The only way for a person actually or potentially exposed to HIV to know if he or she has been infected is to have him or herself tested for antibodies twice, once three months after the possible exposure and again six months after the possible exposure." There are pitfalls to testing the person suspected of transmitting HIV to someone else. If the suspected transmitter tests negative, it does not mean they do not have the virus, but only that their body may not have had time to develop antibodies. If the suspected transmitter tests positive, it means only that they have exposed someone to HIV, which does not mean that the person exposed will inexorably become infected.

At the first hearing, real party agreed with respondent court that "chances are very slight" that HIV can be transmitted by saliva. Real party characterized Dr. Maring's phrase "*theoretically* possible" as meaning "highly remote." Real party also conceded that petitioner's declarations were "certainly accurate and unassailable." Furthermore, real party agreed with the court that testing petitioner "doesn't really tell the deputy anything, except she is possibly exposed to it. But then the deputy would have to be tested. . . ."

Respondent court made a factual finding "that there is no indication at this time before me that the . . . AIDS virus . . . [was] transmitted." The court did find that real party had established probable cause that "saliva was transferred." Because the statute requires only probable cause of transfer of saliva by a bite, the court ordered that petitioner's blood be tested.

This court denied a stay of the blood testing (although stayed most of the permissible disclosure of the test results under the statute). The state of the

---

[2] Similar factual conclusions were reached by two federal trial courts on the evidence presented in *Thomas* v. *Atascadero Unified School Dist.* (C.D. Cal. 1987) 662 F.Supp. 376, 380; and *Glover* v. *Eastern Neb. Com. Office of Retardation* (D.Neb. 1988) 686 F.Supp. 243, 249, 251, affirmed (8th Cir. 1989) 867 F.2d 461, cetiorari denied (1989) __ U.S. __ [107 L.Ed.2d 311, 110 S.Ct. 321].

record was considered inadequate and at points confusing, especially since substantial conflicting medical opinion was presented by real party for the first time in this court in its opposition to a stay. Real party, albeit belatedly, demonstrated there was significant disagreement among medical experts concerning aspects and issues of AIDS testing crucial to the resolution of this case. Accordingly, we remanded the matter to respondent court for further evidentiary hearings so the issues could be decided on a clear record.

The trial court was asked to make a finding of fact on the question whether the AIDS virus can be transmitted through saliva.[3] Our order also made reference to petitioner's argument that the blood testing had to be justified by a balancing of the harm of the intrusion against the reasonableness of the testing. Since petitioner's experts contended that testing the biter is not dispositive of the HIV-status of the bitten person, petitioner argued the intrusion was unjustified. This issue was a major topic of the remand hearing, although we did not ask the trial court for a specific ruling thereon.

Respondent court considered numerous additional declarations, medical articles, and a publication of the United States Department of Health and Human Services' Center for Disease Control. Real party presented numerous declarations of AIDS experts who significantly differed from petitioner's experts in some respects. An illustrative declaration is that of Dr. William Drew, M.D. In Dr. Drew's expert opinion, "based on currently available information, the risk of transmission of HIV from an infected person to another though a bite is extremely low. HIV can only be detected in the saliva of some infected persons and even then it is barely detectable. Given the infrequency of its occurrence in saliva, and given the studies of saliva transmission done to date, it must be concluded that the risk of transmission is remote. [¶] When HIV-infected saliva comes into contact with intact skin, there is no basis for concluding that the saliva could transmit the virus. However, when HIV infected saliva comes into contact with subcutaneous tissue and/or the blood of another, *it cannot be said categorically that HIV could not be transmitted. . . . [T]ransmission of HIV could occur. While the risk is exceedingly low, one cannot say that transmission of HIV in this situation could not occur.*" (Italics added.)

In Dr. Drew's opinion the risk of HIV saliva transfer cannot be discounted completely because of the uncertain state of medical knowledge concerning HIV and AIDS: many of the "issues relating to this disease are matters

---

[3] This case involves only saliva as a possible transfer agent of HIV. Initially, there was some concern that petitioner had blood in her mouth when she bit the deputy. The trial court took a closer look at this issue on remand. The trial court stated it "is of the opinion and will make a finding that there is no evidence to indicate that blood was transferred from the respondent, Johnetta J., to [the] Deputy . . . ."

of continuing inquiry." "Because the disease is lethal, we should err on the side of caution until we have enough evidence to demonstrate that no cause for concern exists. I am unaware of any documented case of transmission by saliva. However, . . . , the evidence is not yet sufficient to enable the medical community to conclude that there is absolutely no cause for concern."

In addition to viewing the theoretical risk of infection in a more cautionary light, the doctor believed there was considerable medical utility in a test of the biter's blood, even if the test is not dispositive. Patients who fear an HIV infection "suffer extreme anxiety because AIDS is fatal. . . . [B]eing informed the risk [of infection] is remote provides little comfort in the face of a lethal disease. Patients are anxious to know the HIV status of the person with whom they have come into contact. *This information is useful for both the treating physician and the patient.* A positive test of the person who may have infected the patient would inform the physician that additional and more extensive monitoring of the patient's medical condition is warranted than would be the case were the results of the test negative. If the results of the HIV test of the source is negative, this information may be useful in helping to allay the concerns of the patient. [Italics added.]

"The results of the blood test are not dispositive. The source of the infection may produce a negative test result for HIV, but may nonetheless be infected. This is because it is possible that the source had been infected but at the time of the test had not yet produced antibodies to the virus. Thus the source could test negative but nonetheless have been capable of transmitting the virus. While not dispositive, the information is nonetheless useful in helping the physician and patient assess the risk of infection. A negative test, even though not dispositive, can nonetheless be of great assistance in allaying the patient's fears.

"Allaying the fears of a patient can be a significant factor in treating that patient. Anxiety itself can cause or complicate medical problems and it can impede recovery. Where a fatal disease is involved, having access to all information bearing on the question of possible exposure can be of great assistance in relieving a patient's anxiety.

"Having all relevant information about potential exposure to HIV also assists a patient in determining the extent to which that patient wishes to make changes in his or her lifestyle to take into account the potential exposure, such as changes in diet and exercise, as well as whether it is necessary to take precautions in intimate relationships." The test of the bitten person is not immediately dispositive of HIV status since the HIV antibodies take up to six months to form, but "[a] test of the potential

source of the infection can provide information to the person exposed during this time period."

Dr. Drew's expert opinions on the foregoing points were essentially echoed by real party's other experts, Drs. Maring, Luce, Sande and Gerberding. (Dr. Sande is Dr. Volberding's supervisor at the AIDS program at San Francisco General Hospital, and is chairman of University of California at San Francisco's AIDS Task Force.) Dr. Maring added the observation that there is a "growing concern" of contracting AIDS among the numerous peace officers and other public safety employees he treats in the course of his practice.

Dr. Gerberding noted there is some evidence of an experimental treatment possibility involving the drug zidovudine, commonly known as AZT. Doses of AZT taken by the victim within a short period of time after a bite might prevent infection. The drug is costly and the treatment "has severe side effects." "The condition of the blood of the biter could be an important factor for the employee to consider in deciding whether to subject his or her body to this prophylactic treatment."

Dr. Luce, the chief of staff at San Francisco General Hospital, stressed that "medical science is still unravelling the mysteries of this new disease. . . . Not enough data has been gathered to date to enable the medical community to advise patients or the public that transmission could never occur through a bite. . . . The question of whether such transmission is possible is still a matter of continuing inquiry. In light of the fatal nature of the disease, it is prudent to err on the side of caution until there are sufficient data to enable the medical community to conclude that there is no cause for concern."

Dr. Luce also opined that a negative test of the biter, while not dispositive, "serves several useful purposes: . . . It informs the patient that the risk of infection is decreased even further. It assists the physician's ability to assess the risk of infection, which will affect the degree of monitoring and other precautions the physician will prescribe for his patient. It also assists the physician in diagnosing and understanding the causes of medical problems that may arise. Information of a negative test result significantly reduces the anxiety of the bite victim. Allaying the fears of a patient can be an important factor in a treatment program. Anxiety itself can cause or complicate medical problems and can impede recovery. Where a fatal disease is involved, having access to all information bearing on the question of possible exposure can be of great assistance in relieving a patient's anxiety."

Real party's and petitioner's experts were essentially in agreement that the risk of HIV saliva transmission was, as variously phrased, "extremely low," "remote," "exceedingly low," "clearly remote," or "highly remote."[4]

Dr. Gerberding declared that "the number of cases to date involving incidents of bites is not sufficient to enable me to conclude that HIV cannot be transmitted by a bite that breaks the skin. Similarly while the risk of such transmission is clearly low, there is insufficient information to determine precisely how low." Both Dr. Gerberding and Dr. Sande agreed that the possibility of saliva transfer is greater when the saliva is placed in contact with broken skin, as in a bite. In Dr. Sande's words: "The possibility of transmitting HIV through a bite is probably greater than the possibility of its transmission through touching, eating off the same plate, or sharing a toothbrush. . . . The possibility of transmission would likely increase if the bite is deep. . . . Studies to date indicate that the risk of transmission is highly remote. However, it cannot be said, based on currently available information, that HIV could not be transmitted through a bite. The possibility that HIV could be transmitted continues to be a subject of inquiry in the medical community."

Dr. Gerberding noted that a bitten health care worker, and by parity of reasoning a bitten public safety officer or bailiff, "finds little solace or comfort in medical opinion that the chances of infection are extremely remote."

Petitioner presented the declaration of Dr. Fannin, who gave his expert opinion that, "There is no evidence whatsoever that HIV is transmitted through saliva or biting. In the tens of thousands of cases of AIDS and the many more infections, there has not been a single documented case. [¶] There is lots of evidence that HIV is not transmitted by saliva. We have looked diligently for HIV infection in persons who would be infected if HIV were transmitted by saliva. We have not found it."

Dr. Fannin noted studies of households including a person infected with AIDS. In household setting where other saliva-transmitted diseases are "transmitted indiscriminately," the studies showed no instance of AIDS transmission. According to Dr. Fannin, this makes it "possible to virtually eliminate saliva as a route of HIV transmission. . . . There is a maxim in epidemiology that if an event can happen, it will happen." The doctor states that tens of thousands of AIDS cases have not revealed a documented case

[4] The Center for Disease Control has reviewed the medical literature and concluded "the potential for salivary transmission of HIV is remote." (U.S. Dept. of Health & Human Services, Pub. Health Service, Centers for Disease Control, "Guidelines for Prevention of Transmission of Human Immunodeficiency Virus and Hepatitis-B Virus to Health-Care and Public-Safety Workers" (Feb. 1989) p. 10.)

of saliva transmission. "Given the amount of information we now have, the only rational conclusion is that transmission by saliva and biting does not occur."

Dr. Conant presented an additional declaration, stating: "In my opinion, HIV is not transmitted by saliva. . . . In the history of this disease, there has never been a single documented case of HIV transmission by saliva. During this period of time, there have been hundreds of thousands of contacts between HIV-infected individuals and uninfected individuals involving the transfer of saliva. These contacts range from sharing utensils to intimate kissing to bites. If HIV was transmitted by saliva, a documented case of transmission should have presented itself by this time. . . . [¶] A different question from whether HIV is in fact transmitted by saliva, is the question whether it is theoretically possible that HIV could be transmitted by saliva in some circumstances. In my opinion, the answer to the latter question is maybe."

Dr. Conant opined that the possibility of transmission "is so slight that a person who was exposed to the saliva of an HIV infected person through a bite has no reason to fear that HIV might have been transmitted through the bite." Dr. Conant further stated that, "When I use the term 'theoretically possible' . . . I do not mean that the possibility of transmission is in any way real or significant. Because it is impossible to prove or conclusively establish negative findings unless the finding in question violates established principles of science, scientists will always say a theoretical possibility exists, even if the possibility is so extremely remote as to be without real value."

At the hearing in respondent court, real party noted that both sides "basically agree" that (1) "it is theoretically possible that [HIV] can be transferred by a bite"; and (2) "the chances are remote, small, exceedingly small, exceedingly remote, slight, no documented cases in 85,000." Regarding Dr. Conant's opinion that there is "no real risk" of saliva transmission, real party argued: "Our physicians have taken a very different view. They have taken the position that the data to date are not sufficient to discount the concern. They do not feel they can assure a patient there is no risk. And on that basis they consider evidence of the condition of the blood of the biter useful information to them in deciding what type of advice to give their client, their patient, what course of treatment that they are going to prescribe for their patient, what type of monitoring. . . ."

Respondent court reviewed for the record several declarations it found most significant. The court noted that even Dr. Conant acknowledged the theoretical possibility of infection if a large quantity of saliva is injected in

the bloodstream of an uninfected person. Respondent court stressed Dr. Sande's opinion that AIDS infection was more likely through saliva, which has been found to carry small amounts of HIV, in the case of a deep, puncturing bite. The court noted the similar opinion of Dr. Gerberding and her cautionary opinion that "there is insufficient information" to determine just how low the risk of saliva transmission may be.

In its concluding finding, respondent court limited itself to a case of a "bite that punctures and breaks the skin," noting this was not a case of potential saliva transmission through such media as sharing utensils, toothbrushes, etc. From viewing the photographs of the bite the court found it was "a very deep bite . . . into the . . . skin." Noting it had not been asked to make "an estimation of what the percentages or relative possibility of the HIV virus being transmitted," the court found: "I am not going to make any decisions as to whether or not it is highly unlikely, extremely unlikely, remote. Or whether it is low, or high, or under such circumstances it is more likely to occur than others. Because all of the medical doctors that the court relied upon seem to suggest that it could. They say theoretically can. [¶] So with that it could be this court's finding that when, as in this particular case, there is a bite and there is [subcutaneous] exchange, that it is theoretically possible for the HIV virus to be transmitted to the person bitten if the person who does the biting is infected with the HIV virus."[5]

## DISCUSSION

Petitioner contends that section 199.97 violates her right under the Fourth Amendment to the United States Constitution and article I, section 13 of the California Constitution to be free from unreasonable searches and seizures. She begins with the premise that a blood test is an intrusion of the body, however minimal, and like other bodily intrusions is governed by Fourth Amendment strictures. She concludes that the mandatory scheme of court-ordered testing falls afoul of the Fourth Amendment (1) because it permits a bodily intrusion for removal of blood for testing without probable cause that the AIDS virus will be found, and (2) because it fails to provide for a balancing test to determine whether the character of the intrusion is appropriate to the circumstances.

---

[5] Proposition 96 is not limited to testing for HIV but includes testing for "such communicable diseases for which medically approved testing is readily and economically available as determined by the court." (§ 199.98, subd. (b).) It is not clear whether the full range of such testing is obligatory, or whether the party seeking a testing order is required to request testing for specific non-AIDS diseases, and present evidence concerning such testing. In this case petitioner was tested for other communicable diseases in addition to AIDS; virtually all of the evidence and testimony, however, has involved AIDS and HIV. Real party appeared below to acknowledge this case is limited to questions concerning transmission of and testing for HIV.

■ Real party does not dispute that "a 'compelled intrusio[n] into the body for blood to be analyzed . . .' must be deemed a Fourth Amendment search." (*Skinner* v. *Railway Labor Executives Ass'n* (1989) 489 U.S. 602, [103 L.Ed.2d 639, 658, 109 S.Ct. 1402, 1412], quoting *Schmerber* v. *California* (1966) 384 U.S. 757, 767-768 [16 L.Ed.2d 908, 918, 86 S.Ct. 1826].) The Fourth Amendment applies to an expectation of privacy "that society accepts as objectively reasonable. [Citations.]" (*California* v. *Greenwood* (1988) 486 U.S. 35, 39 [100 L.Ed.2d 30, 36, 108 S.Ct. 1625, 1628]; see *Katz* v. *United States* (1967) 389 U.S. 347, 361 [19 L.Ed.2d 576, 587, 88 S.Ct. 507] [Harlan, J., conc.].) "In light of our society's concern for the security of one's person, [citation], it is obvious that this physical intrusion, penetrating beneath the skin, infringes an expectation of privacy that society is prepared to recognize as reasonable. The ensuing chemical analysis of the sample to obtain physiological data is a further invasion of the tested [person's] privacy interests. [Citation.]" (*Skinner, supra*, 489 U.S. at p. 616 [103 L.Ed.2d at p. 659, 109 S.Ct. at p. 1412].) Indeed, because of privacy "concerns about bodily integrity" and the potential revelation of "private medical facts," even the nonsurgical collection of breath and urine for chemical testing must be considered a search under the Fourth Amendment. (*Id.*, at p. 616 [103 L.Ed.2d at 659, 109 S.Ct. pp. 1412-1413]; *National Treasury Employees Union* v. *Von Raab* (1989) 489 U.S. 656, 665 [103 L.Ed.2d 685, 701, 109 S.Ct. 1384, 1390].) ■ "The overriding function of the Fourth Amendment is to protect personal privacy and dignity against unwarranted intrusion by the State." (*Schmerber* v. *California, supra*, 384 U.S. at p. 767 [16 L.Ed.2d at p. 917].)

■ The Fourth Amendment's applicability to the mandatory testing scheme of Proposition 96 is not diminished by the fact that the testing is ordered in a civil proceeding and is not designed to discover evidence of crime. The parties essentially agreed below that the filing of a petition for blood testing under Proposition 96 creates a civil proceeding ancillary to the underlying criminal charges. The applicability of the Fourth Amendment, however, is not limited to criminal proceedings. "[T]his Court has never limited the Amendment's prohibition on unreasonable searches and seizures to operations conducted by the police. Rather, the Court has long spoken of the Fourth Amendment's strictures as restraints imposed upon 'governmental action'—that is, 'upon the activities of sovereign authority.' [Citation.] Accordingly, we have held the Fourth Amendment applicable to the activities of civil as well as criminal authorities . . . ." (*New Jersey* v. *T. L. O.* (1985) 469 U.S. 325, 335 [83 L.Ed.2d 720, 730, 105 S.Ct. 733], quoting *Burdeau* v. *McDowell* (1921) 256 U.S. 465, 475 [65 L.Ed. 1048, 1051, 41 S.Ct. 574, 13 A.L.R. 1159].) "It is surely anomalous to say that the individual and his [or her] private property are fully protected by the Fourth Amendment only when the individual is suspected of criminal behavior."

(*Camara* v. *Municipal Court* (1967) 387 U.S. 523, 530 [18 L.Ed.2d 930, 936, 87 S.Ct. 1727], fn. omitted.)

The United States Supreme Court in *Skinner* has removed all doubt that compulsory blood tests are searches subject to the Fourth Amendment, not only because of physical penetration for removal of bodily fluid, but because of subsequent chemical testing leading to the revelation of private medical information. ■ The applicability of the Fourth Amendment, however, is only the prologue: the determination that a particular intrusion is a Fourth Amendment search "only [begins] the inquiry into the standards governing such searches." (*New Jersey* v. *T. L. O., supra,* 469 U.S. at p. 337 [83 L.Ed.2d at p. 731]; *Skinner, supra,* 489 U.S. at p. 619 [103 L.Ed.2d at p. 661, 109 S.Ct. at pp. 1413-1414].) "For the Fourth Amendment does not proscribe all searches and seizures, but only those that are unreasonable. [Citations.]" (*Id.,* at p. 619 [103 L.Ed.2d at p. 661, 109 S.Ct. at p. 1414].) Whether a search is reasonable "depends upon all of the circumstances surrounding the search or seizure and the nature of the search and seizure itself. [Citation.]" (*United States* v. *Montoya de Hernandez* (1985) 473 U.S. 531, 537 [87 L.Ed.2d 381, 388, 105 S.Ct. 3304].) The reasonableness of a particular type of search "is judged by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests." (*Delaware* v. *Prouse* (1979) 440 U.S. 648, 654 [59 L.Ed.2d 660, 667-668, 99 S.Ct. 1391], fn. omitted.)

In most cases the balance is struck in favor of the Fourth Amendment's warrant clause. ■ "Except in certain well-defined circumstances, a search or seizure . . . is not reasonable unless it is accomplished pursuant to a judicial warrant issued upon probable cause. [Citations.]" (*Skinner, supra,* 489 U.S. at p. 619 [103 L.Ed.2d at p. 661, 109 S.Ct. at p. 1414].) As it recently emphasized in *Skinner,* however, the high court has recognized exceptions to this rule "when 'special needs, beyond the normal need for law enforcement, make the warrant and probable-cause requirement impracticable.' "(*Griffin* v. *Wisconsin* (1987) 483 U.S. 868, 873 [97 L.Ed.2d 709, 717, 107 S.Ct. 3164], quoting *New Jersey* v. *T. L. O., supra,* 469 U.S. at p. 351 [83 L.Ed.2d at p. 741] [Blackmun, J., concurring in judgment]; *Skinner, supra,* 489 U.S. at p. 619 [103 L.Ed.2d at p. 661, 109 S.Ct. at p. 1414].) When faced with special needs, the courts have "not hesitated to balance the governmental and privacy interests to assess the practicality of the warrant and probable cause requirements *in the particular context.* [Citation.]" (*Id.,* at p. 619 [103 L.Ed.2d at p. 661, 109 S.Ct. at p. 1414], italics added.)

The concept of "special need" has developed in an *ad hoc* fashion, but has been employed to uphold searches in numerous contexts involving special

circumstances making the warrant or probable cause requirements impracticable. In *New Jersey* v. *T. L. O., supra,* 469 U.S. 325, the court upheld warrantless searches by school officials of student property without probable cause, citing the special need of schools to maintain security and order and an environment in which learning can take place. *(Id.,* at pp. 340, 341 [83 L.Ed.2d at pp. 733-734].) In *O'Connor* v. *Ortega* (1987) 480 U.S. 709 [94 L.Ed.2d 714, 107 S.Ct. 1492], the court held the special needs of government-as-employer justified warrantless work-related searches, without probable cause, of the desks and offices of public employees. In *Griffin* v. *Wisconsin, supra,* 483 U.S. 868, the Court approved warrantless searches, without probable cause, of the homes of probationers. In *Bell* v. *Wolfish* (1979) 441 U.S. 520 [60 L.Ed.2d 447, 99 S.Ct. 1861], body cavity searches of prison inmates were upheld. And in *New York* v. *Burger* (1987) 482 U.S. 691 [96 L.Ed.2d 601, 107 S.Ct. 2636], the court approved searches of the premises of businesses engaged in activities subject to a high level of state regulation.

In *Skinner* the court reemphasized its adherence to the "special needs" doctrine and held that railroad employees involved in major train accidents, or accidents involving death, injury or substantial property damage, may be compelled to submit to blood testing for alcohol and drugs without a warrant and without probable cause or any sort of individualized suspicion.[6] "The Government's interest in regulating the conduct of railroad employees to ensure safety, like its supervision of probationers or regulated industries, or its operation of a government office, school, or prison, 'likewise presents "special needs" beyond normal law enforcement that may justify departures from the usual warrant and probable-cause requirements.' *Griffin* v. *Wisconsin,* 483 U.S. [at pp. 873-874 (97 L.Ed.2d at p. 717)]." *(Skinner, supra,* 489 U.S. at p. 620 [103 L.Ed.2d at p. 661, 109 S.Ct. at p. 1414].) "This governmental interest in ensuring the safety of the traveling public and of the employees themselves plainly justifies prohibiting . . . employees from using alcohol or drugs on duty, or while subject to being called for duty. This interest also 'require[s] and justif[ies] the exercise of supervision to assure that the restrictions are in fact observed.' " *(Id.,* at p. 621 [103 L.Ed.2d at p. 662, 109 S.Ct. at p. 1415, quoting *Griffin* at p. 875 [97 L.Ed.2d at p. 718].)

Having found a "special need" beyond that of ordinary law enforcement in the regulation of a nationwide transportation industry subject to hazardous events caused by the use of alcohol or drugs in railroad operations, the court then concluded that the need, balanced against the privacy intrusion

---

[6]In *Von Raab,* the companion case to *Skinner,* the Supreme Court held that the Fourth Amendment permitted urine tests for certain Customs Service employees in sensitive positions.

of blood testing, made the warrant and probable-cause requirements impractical and justified their disposal.

This court's task would thus seem to be to examine the *Skinner* analysis in light of the blood testing scheme of Proposition 96 and determine (1) whether the blood testing scheme arises from a "special need" beyond the needs of ordinary law enforcement and (2) if so, whether the intrusion of compulsory blood testing for AIDS, without probable cause or individualized suspicion that the AIDS virus will be found in the tested person's blood, is justified by that need. Petitioner, however, argues that *Skinner* does not apply here. She contends that a *Skinner* analysis would "ignore California Supreme Court precedent." Petitioner refers to a line of decisions which formulated a "probable cause-plus" test for forced bodily intrusions for the seizure of evidence.

The line begins with *People* v. *Scott* (1978) 21 Cal.3d 284 [145 Cal.Rptr. 876, 578 P.2d 123], which involved the taking of a semen sample from a child molestation defendant to conduct a test for trichomoniasis, a sexually transmitted disease which the victim had contracted and which she could only have caught from her assailant. "The routine test for trichomoniasis . . . consisted of a manual massage of the prostate gland administered through the rectum and causing a discharge of a sample of semen" for testing for trichomoniasis organisms. (*Id.*, at p. 289.) The People obtained a court order authorizing the test, and the order was challenged on appeal.

*Scott* marked the first time the Supreme Court considered the applicable legal standard for bodily intrusions with a warrant or an order of court. Beginning with *Schmerber*'s general proposition that bodily intrusions can violate the Fourth Amendment, the *Scott* court noted that in prior cases it had held that *warrantless* intrusions of the body had to be incident to a lawful arrest (*People* v. *Superior Court* (*Hawkins*) (1972) 6 Cal.3d 757; 762-763 [100 Cal.Rptr. 281, 493 P.2d 1145]) and conducted under exigent circumstances. (*People* v. *Bracamonte* (1975) 15 Cal.3d 394, 401-403 [124 Cal.Rptr. 528, 540 P.2d 624].) Relying on *Schmerber* and other federal cases, *Scott* indicated that such warrantless intrusions had to be based on "clear indication" that desired evidence would be obtained, as opposed to a "mere chance" (*Schmerber* v. *California, supra*, 384 U.S. at pp. 769-770 [16 L.Ed.2d at p. 919]), and that "the degree of the intrusion, reliability and humaneness, and the conditions under which it is performed have been considered in deciding whether a warrantless intrusion was 'reasonable.' " (*People* v. *Scott, supra*, 21 Cal.3d at p. 292.)

The Supreme Court derived a similar test from federal constitutional law for a bodily intrusion compelled by warrant or other court order. Noting

that the Fourth Amendment bars only unreasonable searches, and that "[t]he human body is not . . . a sanctuary in which evidence may be concealed with impunity," *Scott* ruled that a warrant could authorize a bodily intrusion if (1) there was probable cause to believe that the desired evidence would be discovered, *plus* (2) "an additional balancing test . . . determine[s] whether the character of the requested search is appropriate." (*People v. Scott, supra*, 21 Cal.3d at p. 293.) "Factors which must be considered include the reliability of the method to be employed, the seriousness of the underlying criminal offense and society's consequent interest in obtaining a conviction [citations], the strength of law enforcement suspicions that evidence of crime will be revealed, the importance of the evidence sought, and the possibility that the evidence may be recovered by alternative means less violative of Fourth Amendment freedoms. [Citation.]" (*Ibid.*) "These considerations must, in turn, be balanced against the severity of the proposed intrusion. Thus, the more intense, unusual, prolonged, uncomfortable, unsafe or undignified the procedure contemplated, or the more it intrudes upon essential standards of privacy, the greater must be the showing for the procedure's necessity." (*Ibid.*) *Scott* applied this test to the forced massage at issue and concluded the substantial intrusion, which resulted in an involuntary ejaculation, was "a very significant invasion of both dignity and privacy" which could not be justified given the fact that the testing process was not one of significant reliability. (*Id.*, at pp. 294-295.)

This "probable cause-plus" test was applied in several subsequent Court of Appeal decisions. In *People v. Browning* (1980) 108 Cal.App.3d 117 [166 Cal.Rptr. 293], the court concluded it was unreasonable under the *Scott* test to force an assault victim to undergo surgery to retrieve a bullet which the defendant claimed would be of a certain caliber, and thereby support his version of a shooting incident. In *Shults v. Superior Court* (1980) 113 Cal.App.3d 696 [170 Cal.Rptr. 297], the court upheld an order compelling a woman charged with welfare fraud, as well as her child, to submit to blood testing for the paternity of the child's alleged father. The court noted the blood tests yielded scientifically reliable evidence, that the issue of paternity was highly relevant to the People's claim the defendant had lied about living with the child's father, and there were no less intrusive alternatives to establish paternity. The court also noted that unlike the rectal massage in *Scott*, the taking of blood in a medically approved manner was "neither intense, unusual, prolonged, uncomfortable or undignified." (*Id.*, at p. 700, fn. omitted.) "The taking of blood samples by skilled technicians has long been a routine procedure [citation], presenting only a minor bodily intrusion [citation]." (*Ibid.*) And in *People v. Nokes* (1986) 183 Cal.App.3d 468 [228 Cal.Rptr. 119], the court concluded it was unreasonable to permit the

defendants to force a surgical intrusion into the bodies of their children, whom they had allegedly molested, to search for exculpatory evidence.

The final case in the line is *People* v. *Melton* (1988) 44 Cal.3d 713 [244 Cal.Rptr. 867, 750 P.2d 741], cert. den. 488 U.S. 934 [102 L.Ed.2d 346, 109 S.Ct. 329], a capital case, in which the Supreme Court upheld the trial court's refusal to order a witness to submit to chemical drug tests. The defendant in *Melton* believed a key prosecution witness was testifying under the influence of narcotics. The trial court ordered certain external examinations of the witness to detect recent drug use, but declined to order that the witness submit a sample of blood or urine for chemical testing. After first ruling it was "manifest" that nonparties to criminal proceedings "have equal rights [to a defendant's] against unreasonable bodily searches" (*id.*, at p. 738), the *Melton* court applied the *Scott* test and upheld the trial court's decision. The court noted that the "plus" aspect of the Scott test may require only a "very slight" showing once there is probable cause for "only a minimal intrusion, such as a blood test." (*Ibid.*) The court upheld the order because there was no probable cause that the witness was drug-intoxicated and that evidence of such intoxication would be discovered in his blood.

The "probable cause-plus" test was ultimately adopted by the United States Supreme Court in *Winston* v. *Lee* (1985) 470 U.S. 753 [84 L.Ed.2d 662, 105 S.Ct. 1611]. The *Winston* court read *Schmerber* to require not only probable cause, but a balancing of the various circumstances of a proposed surgical intrusion to determine whether it is reasonable. "The reasonableness of surgical intrusions beneath the skin depends on a case-by-case approach, in which the individual's interests in privacy and security are weighed against society's interests in conducting the procedure." (*Winston, supra*, at p. 760 [84 L.Ed.2d at p. 669].) The factors to be weighed include the severity of the intrusion, the extent to which it endangers life or health, and the benefit to be gleaned from the evidence to be discovered. (*Id.*, at pp. 761-763 [84 L.Ed.2d at pp. 669-671].)

Petitioner essentially contends *Melton* and its predecessors apply to the exclusion of *Skinner,* because *Melton* is supposedly based on the state as well as the federal Constitution. She argues there is no indication *Scott* and *Melton* were based solely on federal constitutional law, and points to a passage of *Melton* which observes, by way of preamble to the Fourth Amendment discussion, "[n]umerous cases have recognized a person's right, under due process and search and seizure protections *provided by both state and federal Constitutions,* to be free from unwarranted bodily intrusions by agents of government. [Citations.]" (*People* v. *Melton, supra,* 44 Cal.3d at p. 737, italics added.)

Petitioner's reliance on the *Scott-Melton* line is understandable. Real party conceded below it had no probable cause that petitioner was infected with HIV. Thus, there is no probable cause that the evidence sought by real party would be found, i.e., that a test of petitioner's blood would reveal HIV antibodies. Under *Scott-Melton,* Proposition 96's blood testing scheme would be unconstitutional absent probable cause that the assailant was HIV-infected, and absent passage of the additional balancing test. Petitioner's contention that *Scott-Melton* prevails over *Skinner,* however, must fail. First, it is clear that the *Scott-Melton* line of decisions is based almost entirely on the federal constitutional decisions beginning with *Schmerber. Scott*'s analysis rests on *Schmerber* and on California cases such as *Bracamonte,* which derive their reasoning from federal law. While *Bracamonte* discusses the state as well as the federal Constitution, it does not enunciate a separate, more stringent test for bodily intrusions than those under federal law. *Melton*'s mention of the state Constitution, standing alone, does not indicate that California courts would impose a different test than their federal counterparts.

■ Although *Winston* and the *Scott-Melton* line of cases remain valid precedent for the more severe intrusions or actual surgery, *Skinner* has relegated blood testing to a realm of lesser protection under the Fourth Amendment. "[A] showing of individualized suspicion is not a constitutional floor, below which a search must be presumed unreasonable. [Citation.] In limited circumstances, where the privacy interests implicated by the search are minimal, and where an important governmental interest furthered by the intrusion would be placed in jeopardy by a requirement of individualized suspicion, a search may be reasonable despite the absence of such suspicion." (*Skinner, supra,* 489 U.S. at p. 624 [103 L.Ed.2d at p. 664, 109 S.Ct. at p. 1417].) *Skinner* declares that the removal of blood for chemical testing is of so minimal a nature that, under certain circumstances, the intrusion can be justified without probable cause in the face of a special need beyond the normal requirements of law enforcement. Harkening back to *Schmerber,* the *Skinner* court noted that "the intrusion occasioned by a blood test is not significant, since such 'tests are a commonplace in these days of periodic physical examinations and experience with them teaches that the quantity of blood extracted is minimal, and that for most people the procedure involves virtually no risk, trauma, or pain.' " (*Skinner, supra,* U.S. at p. 625 [103 L.Ed.2d at p. 665, 109 S.Ct. at p. 1417], quoting *Schmerber* v. *California, supra,* 384 U.S. at p. 771 [16 L.Ed.2d at p. 920].) "The blood test procedure has become routine in our everyday life." (*Breithaupt* v. *Abram* (1957) 352 U.S. 432, 436 [1 L.Ed.2d 448, 451, 77 S.Ct. 408].)

■ Petitioner argues that the blood testing in this case is not minimal because it is more intrusive than that in *Skinner* or in the typical driving-

under-the-influence case in that (1) the psychological impact of receiving a positive AIDS test result "has been compared to receiving a death sentence" (*Doe* v. *Roe* (1988) 139 Misc.2d 1072 [526 N.Y.S.2d 718, 722]), and (2) the Proposition 96 confidentiality measures are in petitioner's view insufficient and likely to lead to substantial disclosure of the test result and possible discrimination and opprobrium. The former factor is indeed significant, and prompted the *Doe* court to rule that mandatory AIDS testing in the context of civil litigation *conducted absent explicit statutory authority* can only be ordered on "a showing of compelling need." (*Id.*, at p. 725; but see *People* v. *Thomas* (1988) 139 Misc.2d 1072 [529 N.Y.S.2d 429, 431] [mandatory AIDS testing for criminal defendant accused of sexual assault "entirely reasonable and proper" under the Fourth Amendment].) As will be seen below, however, the governmental interests behind Proposition 96, including the assaulted officer's fear that he or she has in fact been infected, outweighs the psychological impact of the assailant's receipt of a positive test for HIV.

The confidentiality argument merits consideration although, strictly speaking, it is not a Fourth Amendment issue. Proposition 96 permits disclosure of petitioner's test results to herself, the deputy she assaulted, real party as the deputy's employer and, if HIV-positive, the State Department of Health Services. (§§ 199.97, 199.98, subd. (c).) After testing, "The court shall order all persons, other than the test subject, who receive test results" pursuant to section 199.97, "to maintain the confidentiality of personal identifying data relating to the test results except for disclosure which may be necessary to obtain medical or psychological care or advice." (§ 199.98, subd. (e).)

Petitioner fears this disclosure is too widespread. She argues that the exemption for disclosure necessary to obtain medical or psychological care or advice would allow disclosure to persons not before the court and thus not subject to contempt sanctions to enforce nondisclosure. Although petitioner's concerns are well-grounded in the light of the problem of AIDS discrimination, she reads the disclosure provisions too narrowly. The voters clearly intended that the test results be kept in maximum secrecy and disclosed only to those directly involved and those to whom information must be disclosed to obtain needed medical or psychological treatment—*and to no others.* ■ It is the essence of California decisions on the privacy of medical information that only a compelling state interest can justify disclosure. (See, e.g., *Wood* v. *Superior Court* (1985) 166 Cal.App.3d 1138 [212 Cal.Rptr. 811].) Persons may justifiably receive information from the deputy or the deputy's employer in order to render needed medical care, but those persons are by virtue of section 199.98 barred from in turn disclosing the information outside of the needed-treatment context. The

statutory disclosure provisions are strict and do not render the Proposition 96 blood testing more than a minimal Fourth Amendment intrusion.

This is not to say, however, that *Skinner,* by ruling individualized suspicion is not a "constitutional floor," has relegated blood testing in *in all cases* to the "bargain basement" of the Fourth Amendment where minimal intrusions may be made by the government without probable cause. Certainly a statute mandating blood testing for AIDS of the entire population, or as a precondition for certain rights or privileges unrelated to AIDS infection and not connected to furthering a serious governmental need, would raise serious—and perhaps insurmountable—constitutional objections. Proposition 96, however, is the progeny of a substantial "special need" recognized by the electorate and justifying relaxation of the normal Fourth Amendment requirement of individualized suspicion.

As noted above, the doctrine of "special need" evades clear definition. The decisions which find such a need generally deal with special circumstances involving an increased or enhanced governmental need of control or regulation, such as probation supervision or, as in *Skinner,* the need to prohibit the hazardous use of alcohol or drugs in the operation of railroads, an industry pervasively regulated because of the need for human safety. Real party argues for a "special need" in this case because of the compelling interest of local government in protecting the health and safety of its employees faced with the possibility of becoming infected with HIV in the line of duty. Real party notes the voters have found that peace officers and other public safety employees, when assaulted or otherwise interfered with in the performance of their duties, face the possibility of a frightening fatal infection. Under these unusual circumstances, argues real party, the government has a compelling interest in minimizing the fears of the officer involved, and of securing the best available treatment and the maximum possible information, such as the infection status of the assailant, to facilitate that treatment.

Petitioner counters that no significant government interest is furthered by Proposition 96's provision for blood testing. She contends that the risk of saliva transmission of HIV through a subcutaneous bite is so remote and unlikely that the interests of the government do not justify a bodily intrusion. Thus, she argues, there is no need to test someone who bites a peace officer because there is only a theoretical possibility that the biter's HIV status will be relevant to the state of the officer's health.

The record below establishes that HIV can be found, albeit in small amounts, in saliva. The experts essentially agree there is a theoretical possibility of saliva transfer, and the trial court so found. Although this possibility is extremely low, the majority of the experts agreed that the possibility

cannot be categorically ruled out. The record is replete with expert medical opinion, from some of the very physicians leading the fight against AIDS, that the current state of medical knowledge of AIDS is evolving, that medicine is still "unraveling the mysteries" of the disease, and that the available evidence is insufficient to determine conclusively that HIV cannot be transferred through a bite. They also declare that knowledge of the assailant's HIV status is beneficial to the care and treatment of the victim.

■ This medical opinion supports the voters' determination that the minimal bodily intrusion of blood testing may legitimately be undertaken. AIDS is a fatal disease with which society is locked in struggle. A public safety employee is at constant risk of coming into contact with the body fluids of an assaultive person. Medical opinion expresses considerable uncertainty concerning AIDS and cannot rule out the possibility that a bitten police officer, whose blood is commingled with saliva, may be infected by the AIDS virus. Dr. Gerberding's words echo here: that the bitten public safety employee "finds little solace or comfort in medical opinion that the chances of infection are extremely remote." We reiterate that the law authorizes the minimal intrusion of a blood test only by court order after a noticed hearing and a finding that the prohibited assault occurred. The test must be performed in a medically approved manner, and the results are subject to highly limited disclosure. These circumstances support the electorate's reasonable determination that society's interest in the health and safety of its peace officers, on balance, justifies the intrusion without the additional probable cause that the assailant is infected. Cases in which officers would have probable cause or some individualized suspicion that their assailants were AIDS-infected are rare, in the vast majority of cases the officers will have no way of knowing the infection status of the person who has bitten them. Thus, a requirement of probable cause that the assailant is an HIV-carrier would not be practical; a reasonable solution is to test those persons who assault peace officers if there is probable cause to believe the officer has been exposed to the assailant's bodily fluids.

■ Petitioner also asserts that mandatory testing of the assailant serves no useful governmental purpose because the assaulted officer is free to have his or her own blood tested and that test should be dispositive. This contention cannot withstand the numerous statements of medical opinion in this record, which detail the medical usefulness of testing the person who has assaulted an officer. The experts believe test results from the potential source of infection, while not dispositive, provide some useful information. If the results are negative, the chances of HIV infection are believed to be smaller, and a negative result will diminish the officer's anxiety, a factor pertinent to treatment. The experts suggest that a bitten officer would be well advised to have a blood test for clearer information, but HIV

antibodies generally would not develop for three to six months after the bite. Proposition 96 provides a prompt mechanism to obtain some information pertinent to the officer's health and therefore to the governmental special need. The fact that the test of the assailant's blood would not be conclusive does not defeat the government's interest. Responding to an analogous criticism of the probity of the blood tests in *Skinner* as a measure of drug intoxication or degree of impairment at the time of an accident, the Supreme Court stated that conclusiveness is not a prerequisite for chemical testing of blood. "As we emphasized in *New Jersey* v. *T. L. O.,* 'it is universally recognized that evidence, to be relevant to an inquiry, need not conclusively prove the ultimate fact in issue, but only have "any tendency to make the existence of any fact that is of consequence to the determination [of the point in issue] more probable or less probable than it would be without the evidence." ' " (*Skinner, supra,* 489 U.S. at pp. 631-632 [103 L.Ed. at p. 669] 109 S.Ct. at p. 1421, quoting *New Jersey* v. *T. L. O., supra,* 469 U.S. at p. 345 [83 L.Ed.2d at p. 737], in turn quoting Fed.Rule Evid. 401.)

Petitioner and amici rely on numerous decisions for their argument that a theoretical risk of transmission should not justify a Fourth Amendment intrusion. *Glover* v. *Eastern Neb. Com. Office of Retardation, supra,* 867 F.2d 461, is distinguishable. In that case a Nebraska state human services agency imposed a policy of mandatory AIDS testing of employees whose work brought them in contact with mentally retarded agency clients, because of the possibility of spreading an infection to a client. In a narrow decision, the Eighth Circuit upheld the district court's ruling that the broad policy was unreasonable. In addition to having been decided before *Skinner,* *Glover* was based on factual findings that an infected employee could not infect a retarded client with AIDS by casual contact, and that the risk of a client contracting the disease by biting or scratching an infected staff member was "extraordinarily low . . . approaching zero." (*Glover, supra,* at p. 463.) The factual findings and medical opinion in the instant case are weighed more heavily in favor of blood testing, especially when the testing is done on a person charged with assaulting an officer. Furthermore, *Glover* involved an administrative policy and not a statute, and did not involve a special need, established by popular vote, of protecting the health and safety of law enforcement officers.

In *Chalk* v. *U.S. Dist. Court Cent. Dist. of California* (9th Cir. 1988) 840 F.2d 701, 706-709 also decided before *Skinner,* the Ninth Circuit held that a theoretical risk of casual AIDS transmission was insufficient to bar an infected teacher from the classroom. (Accord, *Ray* v. *School Dist. of DeSoto County* (M.D.Fla. 1987) 666 F.Supp. 1524 [school officials enjoined from barring AIDS-infected children when no risk of spread of AIDS by casual contact]; *Thomas* v. *Atascadero Unified School Dist., supra,* 662 F.Supp. 376

[same, even when child involved in biting incident, because theoretical risk of bite transfer of HIV insufficient to warrant blanket exclusion from educational facilities and opportunities]; *District 27 Comm. School* v. *Board of Educ.* (1986) 130 Misc.2d 398 [502 N.Y.S.2d 325] [blanket exclusion of HIV-infected students violates equal protection]; *Phipps* v. *Saddleback Valley Unified School Dist.* (1988) 204 Cal.App.3d 1110 [251 Cal.Rptr. 720] [upholding injunction against exclusion of HIV-infected student].) Other cases note that mandatory AIDS testing cannot be imposed as a condition upon rights or privileges otherwise available but bearing no relationship to HIV status. (See, e.g., *Doe* v. *Roe, supra,* 526 N.Y.S.2d 718 [testing in child visitation case]; *Jane W.* v. *John W.* (1987) 137 Misc.2d 24 [519 N.Y.S.2d 603] [same]; *People* ex rel. *Glass on behalf of Ryan* v. *McGreevy* (1987) 134 Misc.2d 1085 [514 N.Y.S.2d 622] [negative AIDS test cannot be a prerequisite for release on bail].)[7]

These decisions recognize that the mere fact a person is infected with AIDS cannot be used to remove them from their occupation or the society of others because of some unjustified fear of an infection incapable of transmission by casual contact.[8] Indeed, in both the 1986 and 1988 elections the voters of this state soundly defeated proposed measures for the quarantine of AIDS sufferers. That same electorate, however, has enacted a statute which, in certain narrowly defined situations, permits testing of *a person charged with assaultive conduct* in order to further the significant state interest of public safety employees.

Proposition 96 is not a blanket exclusion of AIDS sufferers from the comforts of human society and the normality of schooling or occupation; it is rather a legislative determination that under certain defined circumstances a minimal intrusion for blood testing is reasonable to further a specific, special societal interest.

■ Petitioner also argues Proposition 96 violates the California Constitutional right of privacy. She correctly notes that the California right of

---

[7] Only a specific, narrowly drawn government interest has been held to justify mandatory AIDS testing. (See *Local 1812, Am. Fed. of Gov. Emp.* v. *Dept. of State* (D.D.C. 1987) 662 F.Supp. 50 [refusing preliminary injunction against mandatory AIDS testing of foreign service employees to be stationed abroad, possibly in areas remote from adequate medical care]; see also *Dept. of Social Services* v. *Janice T.* (1988) 137 A.D.2d 527 [524 N.Y.S.2d 267] [reversing order for AIDS testing of a litigant who bit a bailiff in the absence of a specific statutory provision for same authorizing the court's order].)

[8] "The protective garb needlessly donned by workers transporting a patient with AIDS is reminiscent of the costume worn by physicians treating plague victims in 18th-century France. People known to be infected with HIV have lost jobs, homes and friends. Children with AIDS have been denied access to public schools and in 1987 a major air carrier temporarily refused to transport patients with AIDS. People with AIDS have even been denied transportation to the grave, as some funeral directors have refused to handle their corpses." (Fienberg, *The Social Dimensions of AIDS*, Scientific American (Oct. 1988) p. 128.)

privacy is a fundamental right, explicitly added by the voters to the state Constitution in 1972. (*Central Valley Chap. 7th Step Foundation* v. *Younger* (1979) 95 Cal.App.3d 212, 234-235 [157 Cal.Rptr. 117]; see *In re Lifschutz* (1970) 2 Cal.3d 415, 431-432 [85 Cal.Rptr. 829, 467 P.2d 557, 44 A.L.R.3d 1].) As we have previously noted in another context, however, the California right of privacy is "not absolute" and may be subordinated to a compelling state interest. (*Boler* v. *Superior Court* (1987) 201 Cal.App.3d 467, 473 [247 Cal.Rptr. 185]; see *Planned Parenthood Affiliates* v. *Van de Kamp* (1986) 181 Cal.App.3d 245, 279 [226 Cal.Rptr. 361].) Here the electorate has enacted a statute that finds public safety officers at risk from anxiety and fatal infection in the course of their duties. In the unique circumstances of the AIDS epidemic, medical opinion cannot rule out the possibility of HIV transfer to an officer suffering a bite. The assailant's blood is tested under the statute in a medically approved manner, test results are subject to limited disclosure, and a blood test of the assailant is highly useful to treatment of the assaulted officer. Under these circumstances, the state's interest is sufficiently compelling to overcome petitioner's right of privacy against what we have already concluded is a minimal intrusion. 

 We do not, of course, intimate any opinion on the application of the California right of privacy to broader testing measures not involving peace officers and assaultive conduct, and other measures of exclusion against AIDS sufferers, such as those discussed in *Chalk* and like cases.[9]

## CONCLUSION

The complex social realities of AIDS which have given rise to Proposition 96 have also given rise to careful scrutiny of petitioner's challenge to the statute. In the words of one New York court, "AIDS is a terrible and tragic reality in our . . . nation[ ] and world. Although many approach AIDS victims with sympathy and compassion, AIDS has all too frequently been the occasion for discrimination, stigmatization, and hysteria. As an institution which is and should be a bulwark against discrimination of all kinds, the court system must be especially wary about attacks on individual and social rights made in the guise of health-related AIDS claims. [¶] [T]he potential for misuse . . . cannot be overlooked, particularly when coupled with possible racism or homophobia, given the composition of the major groups 'at risk' for AIDS." (*Doe* v. *Roe, supra,* 526 N.Y.S.2d at p. 726.) The " 'devastating effects of [AIDS] and widespread lack of knowledge about it have produced deep anxieties, and considerable hysteria, about the disease and those [who] suffer from it. . . .' " (*Raytheon Co.* v. *Fair Employment & Housing Com.* (1989) 212 Cal.App.3d 1242, 1252 [261 Cal.Rptr. 197].)

---

[9] Petitioner also briefly argues that Proposition 96 violates due process requirements because the taking of blood is not rationally related to a permissible state purpose. In light of the foregoing discussion the due process challenge is without merit.

" 'AIDS is the modern day equivalent of leprosy. AIDS, or a suspicion of AIDS, can lead to discrimination in employment, education, housing and even medical treatment.' " (*Rasmussen* v. *South Florida Blood Service* (Fla. 1987) 500 So.2d 533, 537 [56 A.L.R.4th 739].)

*Skinner* itself was not decided without a dissenting voice cautioning that "[h]istory teaches that grave threats to liberty often come in times of urgency, when constitutional rights seem too extravagant to endure. The World War II relocation-camp cases, *Hirabayashi* v. *United States* [1943] 320 U.S. 81; *Korematsu* v. *United States* [1944] 323 U.S. 214 and the Red Scare and McCarthy-Era internal subversion cases, *Schenck* v. *United States* [1919] 249 U.S. 47; *Dennis* v. *United States* [1951] 341 U.S. 494 are only the most extreme reminders that when we allow fundamental freedoms to be sacrificed in the name of real or perceived exigency, we invariably come to regret it." (*Skinner, supra,* 489 U.S. at p. 635 [103 L.Ed.2d at pp. 671-672, 109 S.Ct. at p. 1422], parallel citations omitted [Marshall, J., dis.].)

This is not such a case. The electorate has enacted a statute which is narrowly drawn to respond to a serious state interest. Rather than a blanket testing requirement of entire classes of persons, or an exclusion from society, occupation, or housing of persons infected with the AIDS virus, Proposition 96 applies only when (1) a person is charged in a criminal complaint with assaulting or otherwise interfering with a public safety employee and (2) the assailant's conduct has resulted in the transfer of bodily fluids to that employee. Testing cannot occur until a court is petitioned and holds a hearing, at which the court must find probable cause of a fluid transfer. Testing must be accomplished in a medically approved manner, and its results are subject to strict rules of nondisclosure.

We also note that petitioner is not a random, innocent victim of an uncontrolled testing scheme. Under the statutory procedure at issue, testing is permitted only on persons formally accused of assaults or other offenses against peace officers, firefighters and emergency medical personnel resulting in the transfer of bodily fluids. Persons committing criminal offenses are generally forewarned that they are subject to some intrusions on their civil liberties. For example, even prior to any conviction they are subject to arrest, to pretrial incarceration (subject to having to post reasonable bail *if* they can do so, or release on their own recognizance *if* they qualify), to compulsory court appearances, and to reasonable searches and seizures of their persons, houses, papers and effects. In appropriate cases, blood samples may be obtained from the accused. (See, e.g., *Schmerber* v. *California, supra,* 384 U.S. 757; *People* v. *Trotman* (1989) 214 Cal.App.3d 430 [262 Cal.Rptr. 640]; *People* v. *Deltoro* (1989) 214 Cal.App.3d 1417 [263 Cal.Rptr. 305]; see also 2 LaFave, Search and Seizure: A Treatise on the

Fourth Amendment (2d ed. 1987) § 5.3(c), pp. 497-503, & 1989 pocket pt. p. 36.) Petitioner initiated the operation of the statute by her assault upon the deputy, thus voluntarily placing herself in a different category than the innocent or unsuspecting person she hypothecates as a potential victim of a renegade testing scheme.

Accordingly, we hold that with regard to public safety employees suffering subcutaneous bites in the course of their duties, Proposition 96's mandatory scheme of blood testing does not violate the Fourth Amendment or the California right of privacy.

Petitioner has argued forcefully against the wisdom or practical utility of the statute. Although we uphold the statute's constitutionality, we cannot rule on its wisdom. Proposition 96 mandates costly hearings and testing procedures consuming the time and resources of the courts and public entities. Testing, if frequent, will undoubtedly amount to a measurable drain on the fiscal resources of local governments. While the medical opinions of eminent experts support such testing, and while these opinions contribute to the finding of a special need overcoming Fourth Amendment and right-of-privacy challenges to the testing scheme, those experts themselves opine that the only really effective means of determining HIV infection is for the concerned public safety employees to undergo their own tests. Members of the law enforcement community have recognized the limited utility of the testing procedure at issue. An article in the San Francisco Police Officers Association newspaper advises that police officers should be tested if bitten: "A positive test by the [biting] victim is the only way to determine if the disease has been passed on by the assailant." (The S.F. Police Officers' Assn. Notebook, (Nov. 1989) p. 5.) The article concludes that "it appears that more positive energy could be expended in dealing with the AIDS tragedy through education and research rather than through legislation which is not only difficult to enforce but is also of questionable medical value and seems to only add to the hysteria of the AIDS situation." (*Ibid.*)

While we agree in principle with much of this sentiment, it is not for courts to judge the wisdom of legislation. We can only hope that assaulted public safety employees, properly medically advised, will realize the sense of security from a biter's negative test is elusive and will submit themselves for AIDS testing.

The petition is denied.[10]

Low, P. J., and King, J., concurred.

A petition for a rehearing was denied March 20, 1990.

---

[10]This matter has been extensively briefed and the parties have had oral argument. However, the matter was ordered onto the argument calendar on November 20, 1989, without issuance of an alternative writ. To preclude any doubt that this opinion determines a "cause" (Cal. Const., art. VI, § 14), we deem an alternative writ to have issued nunc pro tunc November 20, 1989, and said alternative writ is herein discharged.